STATE OF IOWA, plaintiff, v. DELORES (also known as MARY JO) STEMMLER, defendant.

HILLCREST BABY FOLD, INC., appellee, v. HERBERT G. KELLY et ux., appellants.

No. 47563.

(Reported in 41 N.W. 2d 21)

▆▆▆▆▆▆▆▆▆▆▆▆▆▆

418

FEBRUARY 7, 1950.

Sharp & Roggensack, of Elkader, for appellants.

Walter Paisley, of Dubuque, for appellee.

F. H. Becker, County Attorney, Dubuque County.

HALE, J.—This action arose in the Dubuque County Juvenile Court on the petition of Hillcrest Baby Fold, which is a duly authorized child-placing agency in Dubuque, against Herbert G.

and Mary Joyce Kelly, husband and wife, with whom the agency had placed a child on probation on February 18, 1948. The petition asked that such parties relinquish and surrender such child to the agency. The petition was filed in the original juvenile proceeding in which the child became a ward of the juvenile court, and was resisted by the Kellys.

Herbert G. Kelly was a minister in charge of a church at Elkader, Iowa, in Clayton County. The placement was made as provided by law, section 238.40, Code of 1946. Margaret M. Rickard was a welfare worker at Hillcrest who was succeeded by Mary Richards in May 1948. The child in question, Mary Jo Stemmler, but called "Susan" by the Kellys, was a ward of the juvenile court and had originally been placed with Hillcrest by order of the Dubuque County Juvenile Court. Hillcrest was authorized by such order to place the child for adoption.

In accordance with the statute a contract was executed, and since it is important in the discussion of the case we set out the material parts of the contract:

"AGREEMENT, made and entered into this 18th day of February, 1948, between the Hillcrest Baby Fold of Dubuque, Iowa, party of the first part, and Herbert G. Kelly and Mary Joyce Kelly, husband and wife, of Clayton County, and State of Iowa, parties of the second part, and subject to the approval of the Department of Social Welfare, Division of Child Welfare of Iowa.

"WITNESSETH: That the party of the first part, at the request of the parties of the second part, has placed in the care, custody and control of the parties of the second part, at their home in Elkader, Clayton County, Iowa, for a probationary period of one year, the child, Mary Jo, who was born on the 22d day of January A. D., 1946, and who is an inmate of, and under the care, custody and control of said undersigned parties of the second part hereby covenant and agree to perform:

"To receive said child into their home for a trial period of one year. To treat said child as a member of the family and to give the child proper care, and to love, cherish, nurture and educate said child in a suitable and Christian-like manner, as the parties of the second part would be required to do were it their own child.

"To send said child to school at least nine months of each year, or in accordance with the laws of the State of Iowa. To see that the child shall receive religious education, and attend church or Sunday School when the child has reached the proper age.

"To notify the Hillcrest Baby Fold promptly of any change of address of the second parties, and in no case leave with, or surrender the child to, a third party, or to remove it from the state without the written consent of the party of the first part.

"That the first party shall have at all reasonable times access to the child so placed in the home of the second parties and to the home in which the said child is living, and the second parties agree to relinquish and surrender the said child whenever, in the opinion of the first party. or State Board of Control, such relinquishment is to the best interest of the child.

"It is further agreed that the parties of the second part reserve the right to return the said child to the party of the first part any time within one year from the date of this agreement, for due and just cause.

"And the parties of the second part further agree that after the expiration of a one-year period, and before the expiration of two years from the date of this instrument, the said parties of the second part will make application for the adoption of said child in accordance with the rules and practice of the said Hillcrest Baby Fold, and in accordance with the statutes of Iowa then in force and effect. The parties of the second part agree to pay the cost incident to said adoption proceedings."

The above was duly signed by the Hillcrest Baby Fold of Dubuque, Iowa, by Margaret M. Rickard, and also by Herbert G. Kelly and Mary Joyce Kelly.

Prior to the filing of the petition for removal the Kellys were apprised of the intention of Hillcrest to withdraw the child, and the reason assigned at the time was the pregnancy of Mrs. Kelly. At that time little Susan was about two and one-half years old. Thereafter, on February 10, 1949, the application to remove was filed, entitled, State of Iowa, plaintiff, v. Delores (a. k. a. Mary Jo) Stemmler, defendant. The resistance of Kelly and wife was filed February 23, 1949.

The issues before the juvenile court were whether or not it was for the best interest and welfare of the child that it remain with the Kellys, and whether or not the agreement entered into between the Kellys and Hillcrest Baby Fold should be given full force and effect and the child returned to Hillcrest Baby Fold in accordance with the terms of said agreement. The court decided that the Kellys surrender the child to Hillcrest Baby Fold as being for the best interest and welfare of said child, and in accordance with the terms of the placement contract.

The case was tried as an equity proceeding. The record is long and contains many irrelevant matters. The record is too long to undertake to set out a complete review of the testimony. Both parties agreed, however, that the main issue was the best interest of the child. The decision of removal was eventually largely based on the contract heretofore set out. The return of the child, however, was temporarily suspended until after the birth of the Kelly child. From this ruling of the district court Herbert G. Kelly and Mary Joyce Kelly appeal.

I. The first proposition argued by appellants, the Kellys, is that the judgment of the court is not consistent with the allegations of the application, nor is it embraced by any issue before the court; that the judgment is based upon an entirely different theory than that raised by the pleadings. We are not convinced that the court erred in this respect. The contract was fully set out in the original application of the Hillcrest Baby Fold and recovery of the custody prayed thereunder; the petition reciting that the best interest and ultimate welfare of the child, as well as that of the Kellys, require that the child be relinquished and returned to the Hillcrest Baby Fold. The effect of the contract was in issue.

The cause came on for hearing on February 24, 1949. A large number of witnesses were examined. Among them was Mary Richards, a welfare worker, who testified as to the circumstances attending the original placement of the child, and as to interviews with the Kelly family thereafter; that she had received information from a welfare worker where the child was located, and as to various reports as to the fitness of the Kellys to take charge of the child; that she called on the doctor (Hommel) who had attended the family and received a very discourag-

ing opinion as to the fitness of Mrs. Kelly to manage the child. Afterwards he modified or denied these statements. Much of the testimony was largely hearsay, and it appears that there was introduced testimony of some comment of not much importance concerning the correction of the child in church. There was later offered in evidence a partially completed medical report by the doctor relating to Mr. and Mrs. Kelly.

On one interview of the social worker with the Kelly family, at Mr. Kelly's solicitation, a general talk was had, especially about some superficial matters and some criticism received by the Kellys which Mrs. Kelly had resented. At such interview they had talked about whether the agency's position would be to remove Susan from the home; that she could not tell what would be the agency's position, but that on her suggestion that maybe Susan would have to be removed Mrs. Kelly said: "The quicker, the better; to make a clean break."

Later, about December 1, Mary Richards informed the family that it would be the policy of the agency to remove Susan; that she had also mentioned to the family what Dr. Hommel had told her regarding Mrs. Kelly's instability. Much more was testified to as to the interviews, and there was testimony later as to the welfare worker from Elkader, a Mrs. Lillian Stromgren. As a result of the interviews and observations the welfare workers were agreed that the home was not a suitable place for the child and it should be removed to Hillcrest.

Dr. Emmons of Clinton testified in behalf of the Kellys. He is a private practitioner in psychiatry and neurology. His opinion was that the Kelly home was a suitable place and he could see no reason to think it was not a good home for the child. There was a great deal of testimony from neighbors and friends of the Kellys as to the fitness of the Kellys to care for the child, as well as that of Dr. Hommel. The character of the proposed foster parents was not assailed and the court itself in its conclusions found that the Reverend and Mrs. Kelly are high-grade, fine Christian people, and that was the substance of the testimony of all the appellants' witnesses, including various pastors and leading citizens of their home town.

The difficulty about the testimony throughout was that much of it was guesswork—prediction as to the future of the child and

the good or bad effects of its environment during its probationary commitment; opinions about matters no one could accurately foretell, and about which there might well be a difference of opinion. The testimony was so much of that nature that the court, toward the close of the investigation, felt compelled to demand facts instead of opinions. While much of the testimony was favorable to the Kellys, yet a large part of it was subject to the defect of being only opinion, most generally based on the moral qualifications of the Kellys—a good basis, but not conclusive as to the suitableness of the proposed adoptive parents to the custody of the child.

 II.. It must be remembered also that the legal custody of the child was not in the Kellys but was in the juvenile court, or in Hillcrest as an arm of the court. The court had continual jurisdiction. The contention made by the defendants that the court allowed the child-placing agency to determine for it the question of what is for the best interest and welfare of the child is not so shown by the record. The court did not surrender its right or avoid the duty that is placed in its hands by section 232.21, Code of 1946.

While the testimony of the various witnesses for and against were largely opinions, yet the court had before it certain testimony that none of the social welfare workers approved of the placement after it was made and after they had had an opportunity to observe the family and make investigation. From their observation the visitors and workers had observed that Mrs. Kelly at no time voluntarily expressed love for the child, that she appeared to be cold and took no active part in the proceedings to obtain the child, did not express much interest in the entire matter; that the family physician did not, or at one time had not recommended the home, had referred to the instability of Mrs. Kelly and failed to complete the medical report; the pregnancy of Mrs. Kelly; that Mrs. Stromgren of the child welfare office of Clayton County had received and relayed widespread criticism of the placement, including the criticism of Miss Roseboom, a former child welfare worker of Dubuque County; that Mr. Kelly had had epilepsy a long time before, but not for many years, which he had not divulged to Dr. Emmons, the psychiatrist who was the expert witness for the appellants; that

the child welfare worker of Clayton County, who knew the Kellys personally and for whom Mrs. Kelly had worked for a period of about fifteen months, considered Mrs. Kelly to be a neurotic person.

This does not constitute all of the testimony but is in the main the general points of the evidence presented for the appellees. Not all the matters were of very serious importance, but many of them were. Taken altogether there was evidence that would authorize the court's finding. There was in addition the court's own impression of the proposed parents whom he was in position to observe and appraise; the opportunity to weigh the testimony of the witnesses appearing before him, together with the evidence of character, opinion and other matters, all of which might well assist the court in its conclusion.

On the contrary was the testimony of good character and fine qualities of the Kellys, the later testimony of the family doctor and that of Dr. Emmons. Also, the court might take into consideration the terms of the contract required by law, designed to prevent hasty placements. The final determination of the placement of the child under the law is in the juvenile court and the actual physical custody in that arm of the court which it had designated to receive it.

Throughout the residence of the child in the Kelly home the Kellys knew that such residence was temporary only, and they further knew that the agency had the right to terminate the custody at any time prior to the beginning of proceedings for the adoption of the child. It is upon the judgment of the child-placing agency that the court must to a great extent depend. At the same time, as is fair under the contract, the prospective foster parents were permitted to return the child for proper cause.

 III. The legislature recognized that there must be this probationary period and recently recognized this fact in lengthening the time from a period of six months to one of a full year. Acts of Fifty-second General Assembly, chapter 281, section 2. The restrictions and investigation required are much more complete than formerly. The burden that the recipients of the child assume is so provided for the purpose of protection of the child. Such a contract being so required, it is apparent that the pur-

pose of the legislature was to give child-placing agencies the discretionary power of removal that is essential to proper child placement since the burden of proper placement is no less heavy on the agency than on the adoptive parents.

IV. Various arguments are made by the appellants but they largely center on one proposition about which there is no dispute, that when a question of custody of children is involved it is the paramount duty of the court, as a court of equity, to act for the best interest of the child. And the appellants further argue that the child-placing agency to whom a child under the age of eighteen has been committed by the juvenile court does not have the right to determine for the juvenile court what is in fact for the best interest and welfare of that child; nor does it acquire the right to make that determination either by virtue of a provision in a placement contract or under the provision of section 238.40, Code of 1946.

We are satisfied in this case that the court determined for itself what was for the best interest of the child, and that the agency did not arrogate to itself any such right, but did properly inform the court of the result of its investigation.

We are not greatly impressed with the criticism of the contract whereby the child-placing agency places a child in a home for a probationary period preceding adoption. It is undoubted that it shall be reasonably construed in accordance with the object to be accomplished—the welfare of the child. It is not so one-sided as the appellants argue. The same rights and privileges in the interest of the child reserved to the child-placing agency are also reserved to the proposed adoptive parents. Either party can withdraw within a reasonable time, which time is of extended duration for the very purpose of determining the suitability of the child to the proposed home. Of course the child must become a temporary member of the family both for the protection of the agency and the proposed parents. We must also remember that the state, in authorizing placements in the interest of unfortunate children in its care, has an active interest in seeing that all such placements are well-advised and likely to be of permanent duration. This is not only for the interest of the individual child but for all children who become wards of the state. The contract was temporary in duration and

rightfully so. Contracts of the kind we have mentioned are rightfully construed liberally in the interest of the child. 2 C. J. S., Adoption of Children, section 6; section 232.39, Code of 1946.

V. Since the statutes regulating adoption and the care of neglected children have become much more complete as the years have passed and the state has accepted as its duty careful supervision and care, it is not often that the duty is cast upon the courts to determine disagreements such as is shown by this case and there are few authorities in the decisions. We know of no preceding case in our reports which presents the same or a similar state of facts. However, there have come before the courts of other states cases under similar statutes which embody the general principles involved. See People ex rel. Our Lady of Victory Infant Home v. Venniro, 126 Misc. 135, 139, 212 N. Y. Supp. 741, 745. In this case the child was placed in the care of the proposed adoptive parents with the express understanding that they would not have permanent custody, except with the approval of the relator, after a trial had been made of the newly established relationship between the child and his custodians. As to this the defendants acquiesced and recognized it from time to time as it was called to their attention in connection with the suggestions for home improvement. The court says:

"The defendants were worthy folk, childless, eagerly craving the affection of children, and the hardship of having the child taken from them should not be imposed except for adequate reasons. Doubtless many children have homes apparently less favorable to their best development than that of the defendants. * * * However, the relator, having the duty of providing homes for the children placed out by it, should be given the privilege of choosing such as meet its own standard of fitness."

But the court goes on and says:

"The custody of the child, therefore, is to be determined by the superior right of the claimants to it. The relator has this superior right by virtue of section 303 of the State Charities Law, and to it the custody of the child should be awarded."

The courts of Virginia had before them the case of Turner v. Children's Home Society, 158 Va. 406, 163 S. E. 399, 80

A. L. R. 1125, where various questions came up including the delegation of legislative power. In that case involving the custody of an infant thirteen months of age, and the agency having made a preliminary placement under a contract of almost precise terms of the one in the instant case, the society, after careful investigation for reasons satisfactory to it, decided that the best interest of the infant required that its actual custody be restored to the Society, and its contention was upheld by the court. See also Child Saving Institute v. Knobel, 327 Mo. 609, 37 S. W. 2d 920, 76 A. L. R. 1068.

We are satisfied that under the circumstances the juvenile court was right in finding that the best interest of the child demanded its return to the custody of the agency, and the cause is therefore affirmed.—Affirmed.

All JUSTICES concur.