In re Adoption of Linda Sue Cannon (minor).

No. 48051.

(Reported in 53 N.W.2d 877)

JUNE 10, 1952.

Ross D. Lemke, of Newton, for Dolar C. Cannon, appellant.

Schweiker & Schweiker, of Des Moines, for Clarissa Borts, appellant.

Hammer & Matthias, of Newton, for appellees.

SMITH, J.—Appellees Elmer and Alta Beukema, husband and wife, filed their petition for adoption of Linda Sue Cannon January 4, 1950. The proceeding was brought under chapter 600, Iowa Code 1950, I. C. A. A copy of the written consent of Dolar C. Cannon, father of the two-year-old child and having sole custody of her under the divorce decree, was attached to the petition. Code section 600.3.

The court set the hearing for January 10, ordered that five-day notice to the mother (Clarissa Borts, then living in the State of Oregon) be given by posting and that "because the father * * * has no suitable home for said child * * * and that the petitioners are well acquainted with said child and now have [her] in their home * * * the investigation of said home be and it is hereby waived."

On January 10, 1950, the court signed a so-called decree (filed the 12th) granting the adoption. The record does not show what evidence was produced but the decree recites: "The court further finds that the father * * * who has given his consent * * * has shown the court that this adoption should be made at this time because of the fact that petitioners herein have been

well acquainted with Linda Sue Cannon, minor child herein, since her birth, and have, on different occasions, taken full charge of said child, and have had the care and custody of said child on said occasions."

On May 24, 1950, petitioners themselves applied for an order setting aside the decree because "the absence of consanguinity was overlooked and the investigation of the proposed home was therefore erroneously waived." (Code section 600.2 requires such investigation but provides it "may be waived by the court where the petitioner or one of the petitioners is related to the child within the third degree of consanguinity * * *.") Order was made accordingly and investigation by a Jasper County child welfare worker set in motion.

On February 6, 1951, the court ordered that the application for adoption be (again) set down for hearing on February 12, and notice given to the mother by posting and mailing. On the date set for hearing, the mother of Linda Sue appeared generally and filed objections in which she stated she was remarried and in a home of her own with "income sufficient to support herself, her other child [by a still earlier marriage] and the said Linda Sue Cannon", and that her new husband (in service in Korea) was agreeable to her obtaining custody of the child "and to supporting it as his own child." She asked custody of Linda Sue and that the adoption by petitioners be denied.

There was a motion by petitioners to strike these objections which seems never to have been directly ruled on. The welfare worker reported to the court as of March 9, 1951. March 19, 1951, the case was continued on call of the attorneys for petitioners and for the mother. There was no appearance for the father up to this time.

On May 24, 1951, nearly seventeen months after he signed the consent to adoption, Dolar C. Cannon, the father, filed an attempted withdrawal of same which stated no reason for such withdrawal except that he had "reconsidered all particulars concerning the adoption."

We learn from the testimony that at sometime (probably April 11, 1951) the father did file objection to the adoption but the document was withdrawn during the trial and though introduced as an exhibit it is not certified and we do not know its

contents. We assume he merely stood on the proposition he had an absolute right to withdraw consent and that the case was therefore in the same position as if he had never consented to the adoption and his right to custody unimpaired. That is the tenor of the argument. His right to appeal seems doubtful in view of the withdrawal of his objections, but that question is not raised here and is perhaps academic.

After hearing the evidence on May 24 and 25, 1951, the trial court granted the prayer of petitioners. The two natural parents appeal. They have separate attorneys but present a common brief.

I. We find no merit in the objections to the adoption filed by Mrs. Borts, the child's mother. No criticism is urged by, her against the character or situation of petitioners as proposed adoptive parents and no claim is made that the best interests of the child would not be best served by the adoption, or would be best served by denying the petition.

The mother merely asserts her own present ability to care for the child and asks to resume a parental right of custody she had lost by the divorce decree. She does not assert any interest in the welfare of Linda Sue but alleges that the proposed adoption "would be an irreparable and gross injustice" to herself "as the natural mother of said child."

Nor do we find anything in her testimony that indicates any natural motherly love or interest in the child or care for the child's welfare. There is only the blunt statement "I don't want her adopted out nowhere." At one point she was asked: "And did you have the child with you at all times up to August 7, 1949?" (the date of her departure for Oregon before divorce from Dolar). She replied: "Well, most of the time."

It is argued on appeal that the notice to her of the adoption proceedings was legally insufficient. We need not pass on that. She appeared generally and participated in the trial. Any possible jurisdictional objection was clearly waived. No citation of authorities should be necessary to that point, but see 6 C. J. S., Appearances, section 17c; In re Estate of Tabasinsky, 228 Iowa 1102, 1115, 293 N.W. 578; In re Estate of Ferris, 234 Iowa 960, 971, 14 N.W.2d 889.

II. The real question here concerns the claimed absolute

right of the custodial parent, *without cause or reason given,* to withdraw his consent once given and relied on, and thereby to prevent the proposed adoption. Linda Sue was two years and twenty days old when petitioners took her into their home at her father's request.

The record shows she thereafter had lived with petitioners over seventeen months when final judgment was entered. During that time she had grown into their lives and they into hers. They had come to love her as if she was their own natural child and there is abundant and conclusive evidence that she looked to them and obeyed and loved them as if they were her natural parents.

They had not merely looked after her ordinary physical needs—housing, food, clothing, medical attention (including a tonsillectomy and a complete series of immunization treatments now customary for children)—but they had themselves formed a church connection and before the first adoption order was questioned had the child baptized into the church and had seen to her religious education by encouraging her attendance at Sunday school.

We think these are considerations entering into the question of Dolar Cannon's claimed right to withdraw his consent to the adoption before its legal consummation, delayed somewhat by a regrettable failure to follow the statute in the first instance.

Whether there may sometimes be circumstances sufficient to justify such a withdrawal, or what they might be, we need not and do not now determine. We are agreed the right is not absolute and that the situation here precludes any assertion of it.

Of course no petitioner would have any standing in court without first obtaining the written consent required by Code section 600.3. That requirement is a necessary preliminary to the commencement of action. It and the notice to a noncustodial parent (Code section 600.4) are doubtless intended to make possible the protection of the natural parental relationship from unwarranted interference by interlopers, but also to insure the opportunity for natural parents to safeguard the best interests of the child in the matter of the proposed adoption.

Neither objector here pays any attention to the question of the child's interest. They both stand apparently upon the naked

legal proposition that a parent may encourage and give written consent to an adoption and thereafter, before the adoption is fully consummated, arbitrarily change his mind and, without stating any reason, figuratively speaking "pull the rug from under" petitioner, court and child, and prevent consummation. Such interpretation of our statutes is unthinkable.

■ Our Code section 600.2 provides "no petition shall be granted until the child shall have lived for twelve months in the proposed home. Such period of residence may be shortened by the court upon good cause shown when satisfied that the proposed home and the child are suited to each other." Can this be construed into a provision for time within which a consenting parent may arbitrarily change his mind? We think not.

The case is one of first impression in Iowa. State v. Stemmler, 241 Iowa 417, 41 N.W.2d 21, cited by the objectors, is not in point. It involved a child-placing agency operating under an entirely different chapter of the Code, which expressly requires the agency to embody in its adoption contract the right to withdraw the child for cause within the prescribed trial time. Code section 238.40. In the Stemmler case it was held there was sufficient shown to justify withdrawal of the child by the agency. That decision gives us no aid here.

■ III. The value of a discussion of cases from other jurisdictions is doubtful. Statutes and circumstances usually differ. Both sides on appeal were compelled however to go abroad for support of their respective theses. The trial court did likewise.

The annotator in 156 A. L. R. 1011 concludes that while there is authority for the view that a natural parent's consent may be withdrawn before the adoption has been finally consummated and that while a few courts have held the right to withdraw is absolute, "the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent * * * and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding * * * and cannot be arbitrarily withdrawn * * * where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and

bonds of affection, in the nature of a 'vested right' have been forged between them and the child."

We think this conclusion states a sound rule to follow in the instant case under the provisions of our own statute. Allowing for all variations in statutes and circumstances, the following cases support it: Lee v. Thomas, 1944, 297 Ky. 858, 181 S.W.2d 457, 460; Wyness v. Crowley, 292 Mass. 461, 198 N.E. 758; In re Adoption of a Minor, 79 U. S. App. D. C. 191, 144 F.2d 644, 156 A. L. R. 1001; McRae v. Lamb, Tex. Civ. App., 233 S.W.2d 193.

The last cited case points out that some other Texas intermediate courts hold to a contrary view and that the Texas Supreme Court has not spoken.

We are aware there is language in cases cited by appellants that, lifted out of context, or applied to circumstances different from those existing in the instant case, or not involving those existing here, tends to support appellants'. contention. But an examination of them leads us to conclude they are not controlling. At least we are not disposed to follow them under this record in so far as they seem to announce an unqualified right to revoke or withdraw consent under any and all circumstances. See e.g. State ex rel. Platzer v. Beardsley, 149 Minn. 435, 183 N.W. 956; In re Nelms, 153 Wash. 242, 279 P. 748; In re White, 300 Mich. 378, 384, 1 N.W.2d 579, 581, 138 A. L. R. 1034, 1037. In the most recent White case the opinion concludes: "It is our opinion that under the circumstances of this case, *no vested rights having intervened,* the natural mother had the right to withdraw her consent to the adoption during the 90 days while the probate court still had control over the matter by a rehearing." (Italics supplied.) The italicized words are significant.

We must conclude that under this record Dolar Cannon was, in fairness to petitioners and in consideration for the child's welfare, precluded from withdrawing his consent to this adoption.

■ IV. This brings us to, the all-important issue the parents did not tender, but which is implicit in the whole proceeding —the best interest of Linda Sue. What we have already said under Division II indicates our opinion on it from the nonphysical standpoint.

Consideration of her best physical well-being and oppor-
tunity for a normal life overwhelmingly favors the adoption.
There is conclusive evidence to support the trial court's finding
that petitioners "are proper persons to adopt said child and
* * * good substantial farmers and capable of raising said child
and giving [her] a good home"; also the further conclusion
"that owing to the unstable condition of the mother and father
and the background that it is for the best interests of said child
to be adopted" by petitioners.

It should be noted perhaps that the social-service worker
recommended denial of the adoption. Her report completely
justifies the court's findings, however, except for her feeling that
Mrs. Beukema displayed a slight lack of "warmth" toward the
child; but she bases her recommendation on the ground "that
the natural parents have the knowledge of where the child is
now living and their attitude toward this placement is of such a
nature that the adoption * * * is not recommended."

To turn the child back to either parent on this ground would
be a strange answer to this fear that the natural parents "will
continue to interfere" or that "emotionally the child will never
be free as long as her parents know where she is residing and who
her foster parents are." As to the foster mother's lack of
"warmth", that idea is completely demolished by the overwhelm-
ing testimony of neighbors who had opportunity to see the
mother and child on unself-conscious occasions which the welfare
worker manifestly could not have.

We think the trial court's findings and conclusions are
abundantly supported by the record.

█ V. Again we find a record which makes no pretense of
complying with our rule 340, Rules of Civil Procedure, and our
numerous recent references to it, e.g., Walker v. Walker, 239
Iowa 1055, 33 N.W.2d 413; Phillips v. Smith, 240 Iowa 863, 38
N.W.2d 87; Nelson v. Fisch, 241 Iowa 1, 39 N.W.2d 594; Schoe-
man v. Loyal Protective L. Ins. Co., 239 Iowa 664, 674, 32 N.W.2d
212. We are forced to conclude, either that the attorneys did
not read the rule and decisions or that they deliberately ignored
them.

The "record" here, instead of *abstracting,* sets out the tran-
script in full of the testimony of each witness, including every

preliminary question as to name, etc., every objection, every motion to strike answer, every ruling, argument and colloquy. It constitutes as complete a violation of the spirit of the rule as possible.

The rule requiring abstracting (i.e., "epitomizing, summarizing, abridging", Webster's New International Dictionary, Second Edition) is for the benefit of both court and litigant, designed not only to minimize labor and costs but to ensure a better understanding by the court of the real merits of the case. A record of three hundred and fifty pages that should have been held to one half or possibly one third that volume is unfair to both court and client and should be stricken and the appeal dismissed.

We have nevertheless, considering the nature of the case, elected to consider it, and our conclusion is as above set out. Our leniency in the instant case is not to be construed as a precedent for future violations should there be any such.—Affirmed.

All JUSTICES concur.