THE PEOPLE OF THE STATE OF NEW YORK ex rel. MARY FLANNAGAN, Relator, against CHARLES RIGGIO et al., Defendants.

Supreme Court, Special Term, Kings County, December 18, 1948.

*Edward H. Freiberger* for relator.

*Francis J. Mangravite* for defendants.

HILL, J. Mary Flannagan brings this writ of habeas corpus to compel the return and custody of Mary Anna Young, an infant. After a trial of the issues raised by the petition and answer, I find the facts to be as follows:

Mary Flannagan, the relator, was never married, is thirty-three years of age, and the mother of Mary Anna Young, born June 13, 1948. The relator is a registered nurse who earns $10 per day as such and is now employed as a private nurse with patients in various hospitals.

Prior to the birth of Mary Anna, the relator after consultation with her physician and the defendants' attorney surrendered Mary Anna to the defendants, Mr. and Mrs. Riggio, for adoption by an agreement in writing prepared by the defendants' attorney. During the month of August, 1948, Mary Flannagan advised the attorney for the defendants that she would or might seek the return of Mary Anna. Thereafter she did demand the return of her child, which demand was refused.

The defendants Charles and Mary Riggio, are husband and wife, having lived together as such for the past twelve years. They have no children and for some time they have desired to adopt a child and had consulted with their attorney with respect to securing an infant for adoption. Since Mary Anna came to them they have taken excellent care of her, have planned for her future and are as much attached to her as if she were their own. I find that they are honest, God-fearing people, in their late 30's, and physically and financially able to care for a child.

The defendants resist this application principally on two grounds; the first, that Mary Flannagan gave up, abandoned and released the child to the defendants for adoption by agreement which she cannot now abrogate, and, second, that the welfare of the child requires that she remain with the defendants.

The first proposition deserves little consideration, having in mind that the relator, unmarried and without a family in New York City, two or three days before the birth of her child met the defendants' attorney for the purpose of discussing the release of the child when born and thereafter, a day or two before the birth of the child, again met defendants' attorney in a car, at which time a release was signed, the terms and implications of which she did not understand. At any rate, she was told that the child could not be adopted for at least six months, a fact which she believed and had a right to believe would give her six months in which to make up her mind regarding the future of the child.

"The right of the mother may be relinquished by her, or lost or forfeited by ill treatment or abuse of the child, by a failure to provide for it properly, or by being or becoming unfit to have its custody and control. The mother does not necessarily deprive herself of the right to custody by the mere gift of the child to another. While it has been held or recognized that

contracts or agreements for the surrender of parental rights will be upheld in some cases and that the mother may enter into a contract with the putative father by which she transfers her right to custody to him, it has been stated broadly that a mother cannot irrevocably divest herself of the custody of her child by an agreement, understanding, or contract except in the manner prescribed by law relating to apprenticeship or adoption. * * * The gift or abandonment of the child by the mother may not lightly be inferred from either acts or language induced by grief, discouragement, or mental distress of the mother ''. (10 C. J. S., Bastards, § 17, pp 82–83.)

'' Surrender of custody of a child by a parent to an individual as an incident of adoption by the latter, whether or not by written instrument, is without statutory cognizance. Even though there may be such a written surrender, no person can be legally adopted save in pursuance of article 7 of the Domestic Relations Law which provides, *inter alia,* that such adoption must be on consent of the mother of a child born out of wedlock, unless she has abandoned the child * * *. Accordingly, the surrender of a child to an individual pursuant to a writing does not spell out, necessarily, such irrevocable abandonment of the child as obviates the necessity of the consent of the mother to adoption.'' (*People ex rel. Anonymous* v. *Perkins Adoption Soc.,* 271 App. Div. 672, 673.) Abandonment connotes leaving on a doorstep, putting out of sight and mind, putting away without regard to consequences. Placing in a good home is not such legal abandonment.

I am convinced that the defendants will suffer untold mental anguish should they be required to surrender the child — which is to be regretted — but they have known or should have known that the mother might change her mind at any time within six months. Their attorney knew as early as August that the relator had changed her mind and wanted her child, at which time he was duty-bound to so advise his clients. The surrender is not the ordinary agreement and is not to be treated as such. The circumstances, the implications surrounding the making of the agreement, as well as public policy, must be taken into consideration and I find that the agreement is an expression of intention only and not binding on either party.

The second contention advanced by the defendants has greater merit. The welfare of the child must be given every consideration by the court. Some recent decisions seem to indicate that the welfare of the child is the only consideration. My

view of the law is that although the consideration of the child is the primary consideration, the rights of the parents, and in this case the right of the mother only, must be taken into account. It is not a question of balance between individuals. The question is whether or not the parents are unfit to care for the child and therefore compelling necessity requires that the parents be deprived of the custody and control.

Parents have the natural, God-given right to the control and custody of their children. Every experienced welfare worker could advance a dozen or more reasons why children should be taken from indigent parents or parents who cannot support them. Mothers who require State aid fall in that class, but it is still a good policy to remember that nothing will take the place of parental love and affection.

" Courts are, however, slow to disregard the rights of the mother unless compelled to do so by the best interests of the child, and will not deprive the mother of the custody in the absence of a clear showing that she is not capable of properly caring for the child or that there is some extraordinary reason for placing the custody elsewhere. So in general the court will restore the custody to the mother where she has left the child for temporary purposes with others with no intention to abandon it, and she is a fit person to have such custody and is able properly to care for the child, notwithstanding the persons who have such custody are better situated financially, or have more wealth, than the mother. Furthermore, the mother who is a suitable person is entitled to the custody of the child notwithstanding there may be other persons who are more suitable. While the unmarried status of the mother may have a bearing on the question as to the best interests of the child and as to the mother's moral fitness in a proceeding to determine the right to custody, the unmarried status of the mother does not impair her legal rights and does not prevent the award of custody to her where it appears that she is actually fit to have the custody and care of the child.'' (C. J. S., Bastards, § 17, pp. 81–82.)

I find that the mother is morally and financially able to care for her child; that she has not abandoned the child. It follows, therefore, that the writ is sustained.