## In the Matter of the Adoption of Anonymous.[*]

County Court, Delaware County, April 13, 1950.

*Gleason B. Speenburgh* for " Charles Moore " and another, petitioners.

*Hector B. Giacobbe* for " Mary Mitchell ", respondent.

[*] Names used herein are fictitious for the purposes of publication.

CURTIS, J.  Complexities abound when a court is asked to determine those problems which arise in a contested adoption involving a child born out of wedlock.  The courts have frequently been beset with the conflicting claims of the various persons interested.  We must consider the rights of the natural mother with her inborn maternal instinct to nurture and protect her child.  We have the persuasive claims of the foster parents who, relying on the mother's consent to an adoption, have taken the child in infancy, improved its physical well-being, given it the best of love and care, and in return have received its childish affection, and who protest against a severance of these ties merely because the natural mother arbitrarily or capriciously, as it seems to them, seeks to revoke her consent to the adoption. There are also the rights of the child who mutely stands in the background while the conflict wages, but whose very helplessness demands the protection of the court, and a determination that will promote its welfare.

Less frequently considered, and of lesser importance, are the rights of the sovereign State.  We now have statistics irrefutably establishing that illegitimate children are problem children justifying special governmental interest.  As compared with other children, they are more likely to be juvenile delinquents, and later more prone to criminal activities.  They are poorer students; their origin is ridiculed by their playmates; they develop a feeling that they are different — an inferiority complex.  Some authorities feel that the tie between the mother and the child should be abrupt and final (*Matter of Adoption of a Minor,* 144 F. 2d 644).  Other authorities reason, possibly less logically but more humanely, that the problems may best be solved by permitting the mother to resume the care of the child, thus, in effect, maintaining that the illegitimacy is a factor favoring rather than disfavoring the claims of the mother.  With all these conflicting currents confronting the courts, it is not surprising to find the decisions hopelessly conflicting.

These cases are similar in pattern.  An unwed prospective mother is distraught with fear for her social and employment status, a feeling of guilt, shame and humiliation, a dread of childbirth, anxiety as to her parents.  The future looks dark and forbidding.  In a panic, she plans childbirth without the knowledge of her relatives or friends, and hastily surrenders the child for adoption and signs a formal consent.  Then the picture brightens.  She recovers her health.  Her relatives rally to her support.  She finds that she is not a social outcast.  Her

maternal instinct reasserts its power. Her parents or a brother or sister are willing to aid in the care of the child, or perhaps she marries and her husband joins in her desire for its custody. But in the meantime, the child has been nurtured by others who have given it a home and now love it as their own. They place confidence in the surrender of the child and the written consent for its adoption.

Some authorities have solved this problem easily with a rule that is definite. They hold that the mother may revoke her consent at any time before the order of adoption is signed. They maintain that this is a matter of strict legal right which may be exercised arbitrarily or capriciously, without regard to the possible rights of the foster guardians, or the welfare of the child. (*Matter of Anonymous,* 195 Misc. 6; *Matter of Cohen,* 155 Misc. 202; *People ex rel. Anonymous* v. *Anonymous,* 195 Misc. 1054; *Matter of McDonnell,* 77 Cal. App. 2d 805; *Williams* v. *Capparelli,* 180 Ore. 41; *Lane* v. *Pippin,* 110 W. Va. 357; *Matter of White,* 300 Mich. 378; *Matter of Nelms,* 153 Wash. 242; *Matter of Anderson,* 189 Minn. 85.) Other authorities permit the revocation before, but not after, the expiration of the six months' probationary period. (*Matter of Burke,* 60 N. Y. S. 2d 421; *Matter of Anonymous,* 178 Misc. 142; *People ex rel. Flannagan* v. *Riggio,* 193 Misc. 930.)

Other authorities adopt a view favorable to the foster parents. They maintain that a surrender with a formal consent may not be revoked by the mother, in the absence of fraud, oppression, mistake or other impairing element. Various grounds are urged for this determination: (1) The adoption statute may require such an interpretation; (2) The consent when accepted by the foster parents assumes the dignity of a contract; (3) The equitable grounds of waiver or estoppel preclude a revocation when the foster parents have relied on the consent, and thereby lavished their love and care to the better welfare of the child. Even the mercenary expenditures in household improvements have carried weight (*Lee* v. *Thomas,* 297 Ky. 858); (4) A public policy favoring the adoption of children, particularly those born out of wedlock; (5) The welfare of the child. The validity of any of these grounds can well be disputed, but in the aggregate they present a formidable challenge to the right of revocation. The following cases may be consulted, as denying the right of revocation: *People ex rel. Harris* v. *Commissioner of Welfare* (188 Misc. 919); *Ex Parte Schultz* (64 Nev. 264); *Wyness* v. *Crowley* (292 Mass. 459);

*Matter of Adoption of a Minor* (144 F. 2d 644, *supra*); *Lane* v. *Pippin* (110 W. Va. 357, *supra*), and *Lee* v. *Thomas* (297 Ky. 858, *supra*).

A consent has been compared with a stipulation in a pending cause, which may not be withdrawn except with the permission of the court (*Kalika* v. *Munro,* 323 Mass. 542). It has been said that public policy demands that an adoption statute should not be nullified by a decision which causes the public to feel the consequences of adopting a child without full knowledge that their efforts are at the whim and caprice of a natural parent. (*Ex Parte Schultz,* 64 Nev. 264, *supra.*) No decision has come to our attention where the court has considered that during the probationary period the foster parents might be subjected to unreasonable demands on threats of revocation. The statutes should be interpreted to avoid legalized blackmail.

The tendency in recent years has been to restrict the power of revocation. With practically no dissent, the rule was stated in Corpus Juris in 1936: " Consent may be withdrawn at any time before adoption, even though given in writing, and accompanied by transfer of the custody of the child, and even though the natural parent has abandoned the child." (2 C. J. S., Adoption of Children, § 21, subd. [4], p. 386.) Yet in 1945, the annotating editor of the American Law Reports (Vol. 156, p. 1011) after referring to the annotations on this subject as compiled in 1942 (138 A. L. R. 1038) concluded: " It must now be said in view of the later cases  *  *  *  that the trend of the more recent authority is toward the position that where a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and the proposed adoptive parents have acted upon such consent by bringing adoption proceedings, the consent is ordinarily binding upon the natural parent and cannot be arbitrarily withdrawn so as to bar the court from decreeing the adoption, particularly where, in reliance upon such consent, the proposed adoptive parents have taken the child into their custody and care for a substantial period of time, and bonds of affection, in the nature of a ' vested right ', have been forged between them and the child."

We hold that the mother has no " vested right " to the custody of her child which would permit her arbitrarily to revoke her consent. We maintain that the consent gives the foster parents no " vested rights " to the child. We will not permit these little mites of humanity to be ground between rival

claims of legal title. We conclude that the right of revocation depends on all of the circumstances of a particular case, including such a variety of factors as the financial and physical condition of the mother, her previous mode of life, the circumstances under which the consent was given, the length of time elapsing, the conduct of the parties between the giving of the consent and the attempted withdrawal, and their subsequent conduct, the success or failure of the foster parents in their new venture, their losses in relying upon a possibly ineffective consent, and any other circumstances which might aid the court to solve a difficult problem. Many of the decisions, although not stating the rule precisely in this language, support this conclusion. (*Matter of Davison,* 44 N. Y. S. 2d 763; *People ex rel. Probst* v. *Leo,* 79 N. Y. S. 2d 503; *People ex rel. Hydock* v. *Greenberg,* 273 App. Div. 710; *Matter of Davis,* 142 Misc. 681; *People ex rel. Lentino* v. *Feser,* 195 App. Div. 90; *People ex rel. Anonymous* v. *Perkins Adoption Soc.,* 271 App. Div. 672; *People ex rel. McCarthy* v. *Perkins Adoption Soc.,* 67 N. Y. S. 2d 334; *Lee* v. *Thomas,* 297 Ky. 858, *supra.*)

Counsel for the parties urge their respective claims on the theory that the " abandonment " under section 111 of the Domestic Relations Law and the " consent " required by that section, are always to be considered mutually independent. We conclude that they are interwoven. We appreciate that some courts have decided that, inasmuch as a consent is not required in abandonment cases, the execution of a consent necessarily implies there has been no abandonment (*People ex rel. Anonymous* v. *Anonymous,* 195 Misc. 1054, *supra*). We think that, although an abandonment is clearly indicated, nevertheless the foster parents may wisely secure a consent as some assurance against future difficulty. An abandonment gives the foster parties additional protection against a revocation of the consent. The consent to an adoption seems to this court (contrary to the views of some courts) indicative of an abandonment (*Graham* v. *Francis,* 83 Col. 346). These two factors should be considered jointly in solving the ultimate problem whether the mother has lost her right to protest the adoption.

It has been thought that a surrender to an authorized adoption agency accompanied by a consent, is irrevocable, although a different rule would be applied when the consent is given directly to the foster parents (*People ex rel. Anonymous* v. *Perkins Adoption Soc.,* 271 App. Div. 672, *supra*). Specific statutory enactment is required for a rule which discriminates

against the mother by permitting her to revoke as against those persons with whom she has directly intrusted her child, but denying such right as against strangers taking the child from an agency. Authority for such a rule may possibly be found in section 383 of the Social Welfare Law.

Now for the sordid details. In 1940, when she was about sixteen years of age, " Mary Sullivan ", now " Mary Mitchell ", the mother of the children, commenced housekeeping with " John Murphy ", who was then married but not living with his wife. He had one child. " Mary " contributed to the family circle a child, the result of previous juvenile delinquency. She lived with " Murphy " until May 20, 1948. During this period, four additional children were the result of the meretricious relation. One died, and the two youngest, " Mitchell " and " Ruth ", are the subjects of this controversy. At some indefinite date she seems to have been involved with one " Joseph Mitchell ". No particular significance is given to the similarity of the name of the youngest boy. In the meantime, " Murphy's " marriage had been dissolved through divorce, but he stubbornly declined " Mary's " requests for matrimony. " Mitchell " was willing to take her in honorable marriage but refused to assume the support of her four children. She was faced with one of life's difficult decisions. She chose " Mitchell " and left " Murphy " with the four children in his custody. She did not inform " Murphy " of her intention to abandon the home, but her mother was there at the time and cared for the children until a few days later when a younger sister came and cared for the home. A short time afterward, the sister and " Murphy " were married. " Mary " and " Mitchell " were married June 5, 1948.

After leaving the " Murphy " home, Mrs. " Mitchell " returned only twice, once to secure a few trivial phonograph records, and again on June 15, 1948, when she had an appointment with the petitioners herein for the purpose of delivering custody of one of the children to them.

On the 1st day of June, 1948, after " Mary " had left " Murphy " and the children, they entered into an agreement whereby they agreed to live separately, and " Murphy " agreed to maintain and support the four children without any assistance or care on the part of Mrs. " Mitchell ", except that she agreed to pay $5 a week toward the support of " James " who was not " Murphy's " son.

A Mrs. " Sherman ", " Mary's " aunt, had learned that the petitioners were anxious to adopt a child and so informed them.

Apparently the arrangements for the meeting were made by Mrs. " Sherman ". Thereupon, Mr. and Mrs. " Moore " went to the " Murphy " home on the evening of June 15, 1948. " Mary " was not there, but arrived soon afterward. There seems to have been very little conversation. The purpose of the visit was no doubt well understood, and the petitioners expressed a desire to take the baby, " Ruth ". Thereupon " Murphy " announced that if they took the baby, " Ruth ", they would also have to take the boy, " Mitchell ". The " Moores " decided that they would take both, but stated that they would not take the children if there was any question about " Murphy's " or " Mary's " later asking for their return. Both parents stated they would never ask for the return of the children. The mother of the children exhibited little, if any, affection toward the children or grief on account of the separation.

Over a year elapsed before she called at the " Moore " home to visit the children. Before the expiration of the six months' period she wrote several letters to Mrs. " Moore " confirming her intention to abandon them for adoption. On June 21, 1948, she wrote: " As I told you over the phone, I do not intend to ask for them back." On July 6, 1948, she wrote: " Circumstances made it impossible for me to have them ", and further inquiring about the signing of the final papers. On November 8, 1948, she wrote: " It will soon be time for you to own them legally. Have you heard when it will be? I hope so before long so I can make arrangements etc. to get there." On December 4, 1948, she wrote: " Well, your children should soon be yours legally. Have you heard when the papers are to be signed? I just hope it isn't Dec. 17 as that is my birthday * * * My husband denied me the right to take them and you know how love is * * * but don't worry ' Joan ', I won't back out on my agreement * * *."

Her husband meanwhile had relented in his opposition to the children. He was willing to take the two older children in his home. After the expiration of the six months' probationary period, she telephoned Mrs. " Moore " asking for the children, but this was refused. She also wrote Mrs. " Moore " a letter to the same effect and sought advice from the Otsego County Judge and from an attorney. She did not further press her claims at that time, and on May 17, 1949, wrote to Mrs. " Moore ": " Had word that Delaware County Court wouldn't let you adopt the baby. If it's because I wouldn't sign, just go ahead and get your papers drawed up for adoption as soon as

you can & I will sign them as I have decided to take either one or maybe both of the two older boys. Would you please let me know what is up? "

On August 23, 1949, the petitioners visited the mother for the purpose of having a formal agreement of consent executed by her. Mrs. " Mitchell " willingly accompanied the petitioners to a neighboring village where a notary public was found and apparently signed the consent without objection, although she now claims to have been intimidated by threats that her past adulterous life would be disclosed.

At the present time, Mr. and Mrs. " Mitchell " are living in a two-room cabin with no conveniences, not even running water. They have no income except the $44 weekly earnings of Mr. " Mitchell ". They have an automobile (age and model not disclosed) and have savings of $140. They have with them Mrs. " Mitchell's " two older children, and Mr. " Mitchell " joins in the request that they be allowed the custody of all four children. They plan on making improvements and enlargements to their home, but it is doubtful that they can be accomplished when Mr. " Mitchell " is supporting a family of six on his limited income.

Mr. and Mrs. " Moore " have had the custody of the children for nearly two years, have relied upon the consent, have improved the physical condition of the children, have altered their mode of life, and incurred substantial expense in the care of the children and repairs to their home.

Considering all of the circumstances of this difficult problem, the court concludes that the natural mother has abandoned the children to such an extent, and the foster parents have relied upon her written consent to such an extent, that the mother cannot now object to the adoption. However, this determination does not entirely dispose of the proceeding. The petitioners have not established their status as proper foster parents. The investigator appointed in aid of the court is highly regarded as an experienced social worker. She recommended that the adoption be denied. Upon the hearing many responsible citizens of the community contradicted the report. The attorney for the foster parents asserts that the investigator was prejudiced. The attorney for the mother was not interested in this phase of the case, resting upon a claim of an absolute right of revocation.

An order will be made for the appointment of another investigator, and the proceedings will be continued until the report is available.