Nanette Dembitz, J.
This habeas corpus proceeding, referred to this court by a Justice of the Supreme Court, Appellate Division, was instituted by the natural mother of Baby L., to obtain his custody from Mr. and Mrs. Joseph Maglio, to whom she had released him for adoption in February, 1969. Also pending before this court is Mr. and Mrs. Maglio’s petition for a final order of adoption of Baby L.
Baby L. was born out-of-wedlock to the habeas corpus petitioner, then Miss Sally Carr, on February 9, 1969 in a Miami, Florida, hospital. Following the pattern of many Florida — New York adoptions, Miss Carr had arranged through a Florida attorney before the baby’s birth for his adoption. Miss Carr by choice never saw Baby L., nor did she supply a first name for his birth certificate.[1]
When Baby L. was five days old, Mr. and Mrs. Maglio brought him from the Miami hospital to their residence in New York City where he has remained to date.
LEGAL PRINCIPLES GOVERNING ADOPTION PETITION.
If the adoption petition is granted, the natural mother’s habeas corpus petition must be denied — that is, a ruling in favor of the child’s adoption obviously dictates a negative answer to the habeas corpus question of whether his custody should be transferred to his natural mother.[2] Since this court *294 concludes that the adoption petition must be granted, and it necessarily follows therefrom that the habeas corpus petition must be denied, this opinion will deal with the law controlling adoptions.
The rule now established by the appellate courts is that a deliberate, voluntary consent by the natural mother to her child’s adoption is binding, unless she shows that the welfare of the child requires that her consent be set aside. The primacy of the natural mother’s right to the child is basically recognized; however, her valid waiver of her right will be effectuated except when enforcement is detrimental to the third and silent party, the child — who is under the special protection of the State as parens patrien. And in the determination of whether the child’s welfare requires nullification of his mother’s consent to his adoption, the primacy of her right is expressed in a presumption in favor of her custody and care. (As to this body of law, see Matter of Anonymous, 286 App. Div. 161, 164-165, emphatically rejecting lower court declarations that a mother’s consent to an adoption is revocable at will at any time prior to the final order of adoption; People ex rel. Anonymous v. Anonymous, 10 N Y 2d 332, 335; Matter of Roe v. New York Foundling Hosp., 33 A D 2d 83; People ex rel. Doe v. Edwards, 31 A D 2d 64, 65, affd. 23 N Y 2d 925; see, also, Matter of Bock, 280 N. Y. 349, 353.)[3]
This principle of limited revocability of a mother’s valid consent — that is, the enforcement of a prior consent to an adoption unless the mother shows that the best interests of the child require its abrogation — is the rule in Florida as well as New York and is the majority rule throughout the country.[4] In addition to its propriety from the standpoint of the rights of the mother, this doctrine is eminently desirable from the *295 standpoint of the over-all duty of the courts to protect the welfare of the child. Certainly a mother’s deliberate and uncoerced choice, to cut herself off forever from her child, is reason for a court to require clear assurance that her motives and feelings have so completely changed and have become so stabilized that her care of this previously discarded child now serves his welfare.[5]
Under the controlling principles, the first question is whether Miss Carr’s consent to the adoption was deliberate and voluntary.
petitioner’s consent to adoption.
On February 11, 1969, Miss Carr executed and acknowledged before Florida Circuit Court Judge Hal P. Dekle an agreement and three separate documents of consent to Baby L.’s adoption, as well as a waiver of any further notice in connection with the adoption. On one typewritten form, Judge Dekle added in his own handwriting “by petitioners only” after the words “consents that the infant be adopted”, and Miss Carr initialed this addition. Before the Judge, Miss Carr also executed a lengthy affidavit as to her reasons for placing the baby for adoption, as well as an affidavit as to payments she had received for her expenses. Judge Dekle orally propounded to Miss Carr the question ‘‘ Is this an act of your own free will and volition and the way you want it done ’ ’, and he personally recorded her affirmative answer as well as consistent answers to similar questions.
In the instant proceeding Miss Carr submitted two affidavits from Judge Dekle, executed in October, 1969, and January, 1970 (admitted in evidence by consent), in which he voices regret that he yielded to Miss Carr’s “ insistence to get some papers signed to ‘ get away ’ ” in a hurry, and states that he thinks she was physically uncomfortable, distressed, agitated, and not in a state of mind to exercise “ an informed judgment.” It is clear from the affidavits themselves as well as the testimony of the Maglios’ Florida attorney, Mrs. Helen Taños Hope, that our respected and humanitarian Florida colleague as a matter of social policy disfavors private-placement adoptions such as the instant one.[6] However, a consent to a private- *296 placement adoption stands on the same footing as a consent to an agency adoption (see n. 3, above); and obviously Baby L.’s welfare cannot be jeopardized because of the controversy over proposed innovations in adoption legislation, nor because his mother chose to disregard the available adoption agencies and instead to approach Mrs. Hope (whose name she obtained from another young woman bearing an illegitimate child).
Nevertheless, Judge Dekle’s affidavits sharply pose the issue of whether Miss Carr’s consents, despite their facial validity, failed in fact to represent her informed and deliberate choice. This issue must be determined on the basis of the preceding and surrounding circumstances, which were of necessity outside Judge Dekle’s knowledge but which were developed in the lengthy hearing before this court.[7]
CIRCUMSTANCES SURROUNDING CONSENT.
The putative father of Baby L., according to Miss Carr, was a Dr. L. Petitioner, then almost 22, and Dr. L., age 30, both at the time divorced and living and working in Florida, met on January 1, 1968. In June or July, a month or two after Dr. L. broke off their relationship, she told him she was pregnant; but he was unwilling to accede to her desire for them to marry. After intermittently considering an abortion, Miss Carr returned to her mother’s home in Alabama and in November wrote to Florida attorney Mrs. Hope, asking the attorney in an unequivocal and business-like manner to arrange for her expected baby’s adoption. Miss Carr, who had been a secretarial employee in a county office, was again clear and precise in two detailed letters to attorney Mrs. Hope in December; she asked for reimbursement for her past medical expenses (forwarding her receipted bills) and for an agreement by the adoptive parents to pay for her support for a month following the delivery.
*297 Returning to Florida on December 27, she reviewed her arrangements with attorney Hope in person; filled out a detailed biographical form for the attorney’s use; and signed a typewritten form of “ consent for adoption To the typewritten provision for the adopting parents to pay all medical expenses and attorney’s fees, Miss Carr added the handwritten condition “ plus living expenses not to exceed $300,” and she also added the limitation that the child should be raised only in the Catholic religion (the religion of the Maglios, whom the attorney had described to her, and of the putative father).
It is crystal -clear from this history, together with the entirely credible testimony of attorney Mrs. Hope as to Miss Carr’s telephone calls to her and other conduct on February ll[8], plus the testimony of an older woman friend who accompanied Miss Carr while she was being discharged from the hospital and again when she left the courthouse after her appearance before Judge Dekle, that the consents she acknowledged before him were the result of an informed and deliberate choice. No doubt she had some physical discomfort, as Judge Dekle states, and no doubt she was unhappy at the frustration of her dreams and hopes of marriage; but her attitude on February 11 was that she had unequivocally decided months before in favor of adoption, that she had already repeatedly so signified, and that she wanted no delay in completing any additional formalities so that she could proceed with her plan to return to Alabama. And, despite her hurry, her appearance in the courthouse before Judge Dekle certainly served as a final warning to her that her consent had solemn legal and personal consequences.[9]
Her testimony in this court to the effect that she “ did not know ’ ’ what she was doing on February 11 is unworthy of belief.
ABSENCE OP PRESSURES TO CONSENT.
Out of solicitude for the right of the natural mother, the courts of New York will treat her consent as involuntary, even *298 if deliberate and knowing, if she was subject to special pressures to surrender her baby. Miss Carr, however, was a woman of 23, of considerable sophistication at the time of her consent. She was neither a helpless minor (cf. People ex rel. Anonymous v. Louise Wise Servs., 21 A D 2d 327, 328); nor was she, as in People ex rel. Kropp v. Shepsey (305 N. Y. 465), subject to extraordinary financial or familial pressure. Her initial testimony that she decided on adoption to conceal her pregnancy and save her mother from disgrace in her community, was a fabrication, belied by subsequent admissions as to her conduct during her pregnancy. Nor was Miss Carr driven by destitution, considering, among other means of support, that she received $900 from the putative father, about September 1, 1968, and that she could have lived with her mother during her entire pregnancy.[10] “ With reasonable personal sacrifices ” Miss Carr could have cared for the baby. (See People ex rel. Harris v. Commissioner of Welfare, 188 Misc. 919, 921, 922.)
While Miss Carr’s election of adoption was undoubtedly fraught with pain, she was compelled by no pressure other than her own desires — ■ primarily, it seems, her desire to avoid material deprivation or restriction for the sake of the child, and her understandable desire to marry, ‘ ‘ to strike out anew in life, unencumbered by an illegitimate child.” (People ex rel. Doe v. Edwards, 31 A D 2d 64, 65.) In sum, as in Harris, above, the mother’s consent was “ not a sudden impulse” (p. 921); nor, in contrast to Louise Wise Servs. (21 A D 2d 327, 328, supra) was there any “ vacillation ” by Miss Carr in carrying out her plan to rid herself of the baby, nor were there any other special circumstances that would invalidate Miss Carr’s consent. The only question is therefore whether she has ‘ ‘ established by convincing evidence that the best interests of the child compelled the court to undo what she ha[s] done” (Matter of Roe v. New York Foundling Hosp., 33 A D 2d 83).
BEST INTERESTS OF CHILD.
PROSPECTS FOR CHILD’s FUTURE WITH NATURAL MOTHER.
“ Perhaps the most significant factor to be considered in cases of this kind is the motivation of the mother in seeking return *299 of the child.” (People ex rel. Anonymous v. New York Foundling Hosp., 17 A D 2d 122, 125, affd. 12 N Y 2d 863).
Miss Carr’s change of position about the adoption is inscrutable. Her swing-about is not attributable to her marriage in May, 1969 to a man with sufficient earnings currently to support her, for she testified that she changed her mind in February, only shortly after executing the consents. At that time there had been no alteration in her situation, so as far as can be inferred from the testimony, except that she had then received the final payments from the moneys advanced by the Maglios and from the amount promised for her support by Dr. L. Miss Carr’s sudden switch as to the adoption either was influenced by a desire to secure further support from Dr. L. (who had married in November, 1968) or by some other maneuver involving him; or it was an entirely impulsive lurch; or she has completely concealed from this court her true circumstances and motivations.
Thus, the short interval between the mother’s consent and her expressed desire to withdraw it, is not in this case persuasive in her favor, but under the circumstances instead engenders a distrust of her reliability, of her maternal concern for stability for her child, and of her candor. (Cf. Matter of Roe v. New York Foundling Hosp., 17 A D 2d 122, 123; People ex rel. Doe v. Edwards, 31 A D 2d 64, 66: “ Sporadic changes of heart on the mother’s part do not enhance the interests of the child ”.) Furthermore, confidence in Miss Garr’s intentions towards Baby L. is necessarily diluted by her history of precipitous changes in important relationships and of self-deception or deliberate misrepresentations.[11] And her false testimony that she decided upon adoption to save her mother from disgrace, augments this court’s grave doubt as to her candor and as to the integrity of her present motives. We have seen in the recent notorious case of a child who died as a result of abuse after her return to her natural mother, that a mother’s insistent cry that she has a right to her offspring, is in no way an insurance either of her lasting devotion or of his welfare.
While the court cannot pinpoint Miss Carr’s motivation in attempting to block the adoption, it can say with certainty that "there is a substantial risk of improper motivation.”[12] Also *300 in clear focus is a grave danger that with Miss Carr’s tangled impulses she would treat Baby L. with the excessive antagonism and hostility she has manifested in some other relationships, and indeed that she might again, if it suited her purposes, entirely eschew responsibility for him.
As to the possibility of an interest in Baby L. by other relatives if Miss Carr were given his custody, the putative father wishes no contact with the child, nor does there appear to be any other interested relative of either natural parent. (Cf. People ex rel. Anonymous v. Louise Wise Servs., 21 A D 2d 327, 329, where the interest of relatives was noted as a “ positive factor.”) In view of the brevity of Miss Carr’s present marriage to Mr. Stone[13] and factors tending to make it precarious, as Avell as the possibility of Mr. Stone’s adverse reactions to Baby L. as the son of Dr. L., certainly Mr. Stone cannot be relied upon as a safeguard of Baby L. ’s welfare and security.
Thus Baby L. even more than other out-of-wedlock children, would be peculiarly dependent for an affectionate and healthy upbringing upon a steady and self-sacrificing love on his mother’s part. The evidence as to Miss Carr, including her previous dismissal of Baby L., though ‘‘ with reasonable sacrifice ” she could have cared for him (see People ex. rel. Harris v. Commissioner of Welfare, 188 Misc. 919, 922), indicates that he cannot rely upon her for the enduring sense of responsibility and affection that his best interests require.
PROSPECTS POR child’s FUTURE WITH ADOPTIVE PARENTS.
The Maglios, the adoptive parents, present a sharply contrasting picture of a stable and close family life. Married for 10 years, living in reasonable financial security, they resorted to a series of physicians for over four years in an unsuccessful effort to overcome their infertility due to an organic condition of Mrs. Maglio’s. Baby L., baptised in the Catholic religion as “ Joseph Maglio, Jr.” on March 30, 1969, is completely accepted as the Maglios’ son by them and their relatives, and is thriving in a calm, relaxed, loving home, according to this court’s experienced investigator who twice Adsited the Maglio home.
A court psychiatrist, who examined Mr. and Mrs. Maglio both separately and jointly with Baby L., reported that Mrs. Maglio ‘ ‘ exudes a maternal attitude ’ ’; Baby L. appears ‘[1] happy, outgoing * * * secure, comfortable, and wanted * * * a *301 well adjusted child who shows the benefits of a secure and loving home * * * Both parents * * * have completely accepted this role of parents and treat the child as their own * * * He has reached the age where he has formed strong attachments and relationships to the parents and the severing of these could be nothing other than traumatic.[14] While such a trauma doubtless is remediable, it is most improbable that the extraordinary parental qualities, the steady understanding and patience, required to heal such a wound and prevent permanent damage would be displayed by Miss Carr.
CONCLUSION AS TO ADOPTION AND CUSTODY.
The court must consider a child’s “ claim * * * to be reared by its natural parents * * * and to be freed of the emotional problems associated with the status of being an adopted child ” (see People ex rel. Anonymous v. Louise Wise Servs., 21 A D 2d 327, 329). However, with an out-of-wedlock child like Baby L., in contrast to the child of a married couple as in Louise Wise (supra), there is no likelihood of the child’s knowing both his natural parents; rather, Baby L. would grow up with the knowledge of the putative father’s complete rejection of him and his mother.[15] In short, it is clear that Baby L.’s only opportunity to become a wanted child by both a mother and a father lies in his adoption by the Maglios.
We would abhor a society, as the courts have said, where the State snatches children from their natural parents merely because others are more fit materially or psychologically to raise them. But no such issue of State interference is presented by the case of a deliberate and voluntary surrender for adoption, and in particular by that of Baby L. It was his mother who deliberately, to satisfy her own desires and plans, acted to change his life (see People ex rel. Harris v. Commissioner of Welfare, 188 Misc. 919, 922); it is her deliberate act that would be the source of his trauma if his present beneficial custody were interrupted; and it is due to her own conduct that she *302 can obtain the child only through a positive exercise of State power. Since that exercise would be contrary to his welfare and best interests, this court cannot direct it. (Cf. Matter of Davis, 142 Misc. 681, 687.)
Under the rule that a mother’s voluntary and unpressured consent to a child’s adoption should be effectuated unless his best interests require its abrogation, the consent to BabyL.’s adoption must be given effect by this court. For the reasons already stated, the presumption in favor of the natural mother’s care and custody has been entirely overcome by the evidence. Baby L.’s moral and temporal interests dictate the grant of the adoption petition.
The petition for adoption will be granted upon the appearance of the Maglios with Baby L., in accordance with article 7 of the Domestic Relations Law. The writ of habeas corpus is denied.

. In the hospital Miss Carr assumed the last name of the putative father, a Dr. L., and the birth certificate therefore terms her infant Baby L.

. While it is possible for the petitioning adoptive parents to retain custody of the child even though they are denied adoption (Matter of Cohen, 155 Misc. 202; see Matter of Bistany, 239 N. Y. 19, 24; but, see, People ex rel. Anonymous v. Anonymous, 14 A D 2d 41, 45, deploring this result), the converse is impossible. The approval of an adoption in effect includes a finding that the child’s welfare requires custody in the adoptive parents rather than the natural mother.

. These cases apply the same doctrines, whether the consent relates to adoption through an agency or by specific individuals.

. See Skeen v. Marx (105 So. 2d 517 [Fla. App. 1958]); Matter of Arnold (184 So. 2d 192, 194 [Dist. Ct., Fla., 1966]), emphasizing that a voluntary and uncoerced consent cannot be withdrawn. (And see Florida Code, Adoption, § 63.081.) As to the other States, see Matter of David (256 A. 2d 583, 587 [Me, 1969]), where the highest Court of Maine, carefully reviewing this field of law, refused to permit revocation of a judicially acknowledged surrender a few days after it was given, but pointed out that “ the court has an equitable discretion to set aside the surrender if it finds that the surrender would act to the detriment of the child.” See, also, Matter of Adoption of a Minor, 144 F. 2d 644, 648-650 (C. A., D. C., 1944); Kalika v. Munro, 323 Mass. 542. Note, Parental Right to Withdraw Consent in Adoption Proceedings, 30 St. John L. Rev. (1955) 75, 79, and Matter of Anonymous, 198 Misc. 185, 188, as to majority rule.

. If the consent was coerced or involuntary, not only is it unenforceable under basic standards of justice, but also the emotional prospects for the child with the natural mother are likely to be more promising than if she had deliberately disowned him.

. It was reported that there were approximately equal numbers, nationally, of private-placement adoptions (by nonrelatives) with those through adoption agencies, and that approximately one half of the former were satisfactory as *296 compared with three quarters of the latter. (See Grellhorn, Children and Families in Courts of New York City [1954], pp. 248-251.) A substantial expansion of agency services would be a necessary concomitant of any prohibition on private placements. See Note, Moppets on the Market, 59 Yale L. J. (1950) 715, 724, as to the arguments for and against private-placement adoption and as to the need for laws protecting the privately placed child from interference after he is settled in the adoptive home.

. At a two- and one-half-day hearing (at which counsel were allowed considerable latitude because of the nature of the issue and the absence of any pretrial procedures), -the natural mother, her present husband, the putative father, two Florida friends of the mother, Florida attorney Mrs. Hope, Mr. Maglio, and this court’s probation officer testified.

. Besides the other documents she executed on February 11, Miss Carr also filled out and signed a questionnaire prepared by attorney Hope headed “ Questionnaire re Health History (to be filled out to acquaint the Court with the health history of the natural parents and to assist the petitioners in caring for the minor herein.) ”

. In the Surrogate’s Court, which prior to 1962 had exclusive authority over adoptions in New York City, an appearance by the natural mother in a court of equivalent jurisdiction was regarded as the best method of insuring the voluntariness of her consent. (Gellhorn, Children and Families in Courts of New York City [1954], p. 257.)

. In addition to the $900, in October Miss Carr and the putative father, Dr. L., entered an agreement for him to pay her $40 weekly during her pregnancy and for her to place the expected baby for adoption. However, Miss Carr obviously knew that without such an agreement she could recover from the putative father a reasonable amount for her expenses and for support of the child. (See Fla. Stat., Domestic Relations, § 742.031.)

. Por example, Miss Carr gave conflicting versions of her prior marriage to her present husband — ■ including the version that it was “ just a joke”, and of her separation from a Mr. N. after a week of marriage; and she failed to list her divorce from Mr. N. in her application for a license for her present marriage.

. See Matter of Roe v. New York Foundling Hosp. (17 A D 2d 122, 125, supra).

. “ The marriage has not been of sufficient duration to warrant risking the welfare of the child” (Matter of Benning [Nigro], 303 N. Y. 775, 776).

. The psychiatrist, who again saw the Maglios and Baby L. after the court hearing, reported no change (as a result of the confrontations at the hearing) either in their absolute commitment to him or in his excellent development and adjustment. Counsel stipulated to the admission in evidence of both psychiatric reports, which were both disclosed to them.

. As to the other handicaps of an illegitimate child, see Gray and Rudowsky, The Court Acknowledges the Illegitimate, 118 Univ. Penn. L. Rev. (1969) 1; Krause, Legitimate and Illegitemate Offspring of Levy v. Louisiana — First Decision on Equal Protection and Paternity, 36 Univ. Chicago L. Rev. (1969) 338.