LOUISE MABBITT, a minor, by MARIE L. CARTER, her next friend, in behalf of David Dean Mabbitt and Daniel Dale Mabbitt, appellee, v. HAROLD GLEN MILLER et ux., appellants

No. 48539.

(Reported in 68 N.W.2d 740)

March 8, 1955.

Smith, Pogge & Stageman, of Council Bluffs, for appellants.

David E. Burrows, Leo F. Connolly and J. Leo Connolly, all of Council Bluffs, for appellee.

MULRONEY, J.—This is a habeas corpus action brought by a mother by her next friend, seeking to change the custody of her infant sons who, she alleged, were illegally restrained by defendants. The petition for the writ alleged the "pretense of such restraint" was a written release, a copy of which was attached as an exhibit, and the petition alleged this release, which was signed by the mother, was illegal because "procured by threats, promises, coercion, and fraud." The prayer of the petition does not ask that the children be turned over to the mother. It prays that the children "be discharged from said illegal restraint or imprisonment; and that the court make such other and further orders as are proper."

The defendants answered, stating their custody of the children was based on the release and consent to adoption, and they

denied this was obtained by threats, promises, coercion or fraud but instead was freely and voluntarily executed and given to them by the mother and it would be for the best interests of the children that they remain with the defendants and defendants be allowed to adopt them under adoption proceedings which had been initiated.

The mother of these children, Louise Mabbitt, was, at the time of the trial, a sixteen-year-old inmate of the State Training School for Girls at Mitchellville, Iowa, and her next friend, Marie L. Carter, was the superintendent of that institution. It early developed in the trial that this was not a case where the mother seeks custody of her children who are illegally restrained of their liberty. Rather it is a contest between Iowa Annie Wittenmyer Home in Davenport and the defendants, with both parties holding releases and consents to adoption, executed by the mother. The trial court held the first release and consent to adoption, given to defendants, was invalid and the second to the Iowa Annie Wittenmyer Home, a state orphanage (Chapter 244, Code, 1954), was valid. The court ordered the children turned over to the orphanage and defendants appeal. The orphanage is not a party to this action. It is well to state there was no attack made that plaintiff was not the real party in interest though long before she brought the action she executed the release and consent to adoption to the orphanage, which instrument she concedes was fully and voluntarily given.

While Louise Mabbitt was a parolee of the Iowa State Training School for Girls at Mitchellville she became pregnant and, because of that fact, her parole was revoked and she was returned to the training school. On May 21, 1953, she was taken to the Booth Memorial Hospital in Des Moines, and there, on July 11, 1953, gave birth to twin sons who were named David Dean and Daniel Dale Mabbitt. Louise was sixteen years old, unmarried, and the father of the twins is unknown or at least unnamed in the record. When the twins were about nine days old, Louise, who was still in the hospital, executed an instrument called a Release of Children. The instrument is not long and the following quoted paragraphs constitute the pertinent portions, and over half, of the entire instrument:

"I further state that it is my desire that said children above named be released unto Harold Glen Miller and Marjorie Miller, husband and wife, of Council Bluffs, Iowa, for adoption and I do hereby assign, relinquish, and transfer all of my rights with reference to the permanent care and custody of said children to them. * * *

"That I hereby expressly waive all notice of any kind and character with reference to proceedings to adopt said children without further notice to me, and do expressly consent that a Decree of Adoption of said children may be entered as provided by law, and that the District Court of the State of Iowa, in and for ———— County, shall have jurisdiction of all the parties and the proceedings incidental to the adoption of the above named minor child, as provided by law."

A few days after the execution of this instrument (July 20, 1953) the twins were delivered to defendants and taken to their home in Council Bluffs where they were living at the time of trial the following October. On August 17, 1953, the Millers filed their petition for adoption of the twins in the Pottawattamie District Court. When this petition was filed the judge entered an order for the investigation of the Millers by the State Department of Social Welfare. Later another order was entered in the adoption proceedings by the Pottawattamie District Court for an investigation of the Millers by the County Juvenile Office. It appears the second order was entered after the court learned the Millers had earlier adopted another child and the County Juvenile Office had made the investigation for that adoption.

I. The only pleaded issue between the parties is the validity of the release. Was it procured by threats, promises, coercion or fraud? When the twins were born, Louise's mother was advised Louise would not be allowed to keep the children as she had to return to the training school. Louise's mother made some effort to get the children but Louise refused to let her have them. Louise's nineteen-year-old sister Rose, who was then working for the Millers, had a talk with Mrs. Miller who said she would be glad to get the twins. Louise testified that a few days after the twins were born her sister Rose came to visit her and brought a

letter from Mrs. Miller wherein Mrs. Miller asked for the twins. It was Louise's version that the letter stated the Millers would merely take care of the children until she was eighteen and that Rose, who she said read the letter to her, made statements to the same effect, and Rose also stated she was going to stay at the Millers and take care of the children until Louise was eighteen. This is not the version of Mrs. Miller and Rose. The letter which was introduced in evidence by Rose was as follows:

"Hi Louise.

Well how are you & the boys, fine I hope. I sure envy you the twins, wish it could have been me.

Your Mother called Rose & told her about the twins that you would not let your Mother have them, and you were going to adopt them out.

You know that time you were at my house, I told you if you weren't going to keep your baby, I would like to adopt it.

So if you are going to adopt the twins out, I would love to have them, as you know I love children, or I wouldn't have Robin, and you told me before how you felt about your folks. Well that is up to you, I think I know what you mean. I have talked to your Mother & Dad and they will sign paper to agree to me adopting the boys if you want them to.

So you can talk to Rose and if you want to adopt the boys to me I will have a Lawyer make out the papers and will come up there and bring the twins home, and raise them as my own.

I don't want you to think I am doing this for your *Mother*, *as I am not* AND I will not let them go to her home I will bring them to my house & adopt them as Harold & I both would love them as we do Robin. So you let me know what you want to do.

Lots of Luck<br>Marj."

Louise said this could not have been the letter for there is nothing in it about Mrs. Miller taking the children until she became eighteen. But Rose who is an office clerk in a large transportation company was positive in her statement that this was the letter she read to Louise. She said Louise asked her to read it for Louise cannot read very well and she said there was no misrepresentation and nothing was ever said during her visit

about the Millers only keeping the children until Louise was eighteen. She said Louise thoroughly understood this was going to be an adoption and was very happy about it. She also said there was no talk of her staying with the Millers to take care of the children —that she and Louise visited about the possibility of Louise going to Simpson College that fall.

When Rose returned to the Millers she reported that Louise would be glad to have them have the twins. The next day Mrs. Miller and Louise's mother drove to Des Moines in Mrs. Miller's car and went to a lawyer's office where the release was drawn up and the lawyer then went with the women to the hospital. At the hospital they were informed only two people could enter Louise's room and they could only stay five minutes. Louise's mother and the lawyer entered and the lawyer testified he gave the release to Louise, mentioning the papers to her as "adoption papers." He said she glanced at them and kept them in her hands for several minutes and then said: " 'Does Mrs. Miller get the children?' " and he replied "yes" and she told her mother she was very happy Mrs. Miller was getting the children. The lawyer said Louise appeared to know what "adoption" meant. The lawyer is fully corroborated by Louise's mother and in fact he is corroborated by Louise even to the point where she admits the lawyer told her this was an adoption instrument that she was signing and she said she told her mother and the lawyer she was glad the children were going to the Millers.

There is not the slightest evidence that the release was procured by any threats, promises, coercion or fraud on the part of the Millers. The only argument on the part of the plaintiff is that it was signed by Louise under the "false impression" as to its import. The argument is that Louise was given to understand the instrument was merely a release of custody to the Millers until she was eighteen. It is not argued the Millers told her this. It is argued the false impression was created by statements made by her sister Rose and her mother. We have already detailed Rose's denial of any such statements. Her mother was just as positive in her denial. She too testified for defendants saying she never made any statements to Louise about her giving the twins to the Millers only until she reached age eighteen. The mother said she had never at any time had any conversation with

the Millers about their taking the children only until Louise reached age eighteen. She said the lawyer told Louise that she was signing the adoption papers to the Millers and nothing was said "about Mrs. Miller keeping the children only until Louise reached her eighteenth birthday."

Louise stated the day after she executed the release to the Millers she wrote a letter to Mrs. Miller telling her how fine she thought it was she was taking the twins. She said it was stated in the letter that she was glad the Millers were going to keep the children until she was eighteen. When confronted with the letter she admitted she was mistaken. The letter, which was introduced, expresses her relief and joy that the twins were going to the Miller home rather than some state institution. In the letter she says she is happy that the twins will now "have everything they need * * * I know that the boys will have the best of care and have the love they need." There is nothing in the letter to indicate Louise thought the twins were going to the Millers only until she became eighteen years old.

From the above it will be seen the false-impression theory is based entirely on Louise's statement that she did have a false impression and this was caused by statements her sister and mother made. The latter deny the statements and their denials ring true. At this point it would be well to make some general observations with respect to Louise's testimony, as disclosed by this record. It will be remembered Louise was still in the training school at the time she was testifying. It is perfectly apparent that this action was instigated by the superintendent and possibly others connected with the Board of Social Welfare or the orphanage. It fairly appears from the record that Louise was afraid of Marie L. Carter, her next friend, in this action. Her testimony is full of contradictions and discrepancies and during the trial she visited with Mrs. Carter about her testimony on trips home after a day in court. The next day she would be recalled and she would change her testimony and say some of her prior testimony was untrue.

Without further review of the testimony we hold plaintiff failed to establish that the release was procured by threats, promises, coercion or fraud. It would seem this should decide the case, for the only allegation in the petition was that the release was

invalid and therefore defendants' restraint of the twins illegal. The petition is merely to test the validity of the release. There was no allegation in the petition that the defendants, or their home, were unfit or that it would be for the best interest of the twins that they be removed from the Miller home. The general rules of pleading and practice, governing civil actions, apply in a habeas corpus case to determine custody of an infant. 39 C. J. S., Habeas Corpus, section 74. Defendants in their answer did plead it would be for the best interest of the twins that they remain with them and plaintiff filed no reply. No argument is made that the issue of the best interest of the children was not presented by the pleadings. The case seems to have been tried on the theory it was and it is argued on the same theory.

It cannot be said the trial court's decision was actually based on a finding the defendants or their home were unfit. The trial court found the release was invalid because signed by Louise under a false impression, and then the court incidentally mentions it would be for the best interest of the children that they be placed in the orphanage under the release and consent to adoption which the orphanage had secured from Louise; which release and consent to adoption the trial court found valid.

II. We are of the opinion the plaintiff failed to establish the defendants or their home were unfit. In view of the pleading record, and the fact that this issue will probably again be present in the pending adoption proceedings, we do not feel we need make an extended review of the mass of testimony on this issue.

Three reasons seem to be advanced why the Millers and their home are unfit. They are (1) the Millers live in a basement home (2) Mrs. Miller's four previous marriages ended in divorce (3) the discrepancy in their ages is too great as Mrs. Miller is 38 and her husband 27. They seem formidable when merely stated but there are explanations and circumstances that refute a first impression. As previously pointed out, there were two investigations of the Millers and their home in the adoption proceedings; one by Miss Davies of the Board of Social Welfare, whose report was adverse to the Millers, and one by Mrs. Pettie of the County Juvenile Office whose report was favorable to the

Millers. The reports were introduced and there is a controversy as to their admissibility, which we will not decide, as both investigators testified, giving the substance of their reports.

We can eliminate the basement home as a reason for unfitness, quickly. Mr. Miller is a brick mason and they are building a new home, with Mr. Miller doing most of the work. They moved into the completed portion, the basement, and they are living there temporarily as they continue to work on, what the record shows, will be a $45,000 home. Both investigators testified the five rooms in the temporary home are very large and adequately furnished. The temporary home is completely modern with partitioned rooms and complete kitchen equipment including refrigerator and deep freeze. Moreover the Millers have other assets and property and they offered to move out of the basement home and buy or rent a house and live there until their home was constructed, if the court wished that done. Their monthly income is approximately seven or eight hundred dollars a month.

There is not much use detailing the evidence with regard to Mrs. Miller's prior divorces. She was first married at seventeen, and it appears she was married to men who drank to excess and she suffered much abuse and cruelty from them. She had a daughter, Lois, by one of her husbands, and Lois, who is now married, testified for her mother. There is convincing evidence in this record that Mrs. Miller is a woman of excellent character and that she has at last found a mate for an enduring marriage. Lois's birth caused an operation which rendered her unable to bear any more children. She is full of motherly love and she showered it on these twins. Mr. Miller loved the twins and when they came he immediately took out an additional $25,000 life insurance policy with the children contingent beneficiaries. They took the twins to their doctor, and immediately laid in a supply of cases of baby food, and Mrs. Miller went to work on her electric sewing machine making dozens of gowns, diapers, pinning blankets, and sheets.

Mr. Miller knew all about Mrs. Miller's prior divorces before he married her in 1950. He said he and his wife never had an argument and they loved each other and that their marriage has stability. He said he had a deep love of children. The Millers

do not drink and they share their recreation, which is hunting and fishing. Mr. Miller described all of the things they bought for the babies, and all of the sewing Mrs. Miller did. He did not know of any children who would ever get better care than Mrs. Miller would give the twins. He described his wife as one of the working mothers of this world, saying: "My wife is forever working. She is just like a machine. She is always doing something."

Mrs. Miller is 38 years old and her husband is 27. It cannot be said the age difference of 11 years renders them unfit. It seems to have been considered by all who knew them as hardly noticeable. Mr. Miller said the age discrepancy had no bearing on their relationship. Others testified they were compatible and well suited to each other.

The Millers now have one child, Robin Lynn, whom they adopted in the summer of 1953, through the usual adoption procedure and after a favorable report had been made to the court by Mrs. Pettie of the County Juvenile Office. Robin is two years old.

Under the whole record we are convinced the plaintiff failed in her burden to establish the defendants and their home were unfit and it would be for the best interest of the twins to remove them from the Millers' custody and home. There was no presumption here as sometimes exists in favor of a parent seeking the custody of a child. Before this action was ever brought, in fact the day after the adoption petition was filed, Louise was called to the superintendent's office in the training school and presented with the release to the orphanage and advised by Mrs. Carter to sign it. This gave the orphanage no rights unless the prior release was invalid. We hold the prior release was valid and there is insufficient showing the Millers or their home were unfit. Consequently the judgment of the trial court is reversed and the cause remanded for decree dismissing the petition.—Reversed and remanded.

All JUSTICES concur.