In re Estate of Margaret Sterling, deceased.

Leslie D. Sterling, appellee, v. Everett A. Sterling et ux.,
appellants.

No. 49410.

(Reported in 92 N.W.2d 138)

SEPTEMBER 16, 1958.

H. E. deReus, of Knoxville, and Life & Davis, of Oskaloosa, for appellants.

Jones, White & Johnson, of Ottumwa, for appellee.

WENNERSTRUM, J.—This appeal has developed by reason of an order approving the final report of Leslie D. Sterling, administrator of the estate of Margaret Sterling, deceased, over the objections of Everett A. Sterling, a brother, and also the entry of a decree quieting title in Leslie D. Sterling to the land here involved. The two actions were consolidated for trial by agreement and were tried in equity. By reason of the order and decree entered the parties adversely affected have appealed.

Emery Sterling, the husband of Margaret Sterling, died intestate on February 17, 1940. He owned a 200-acre farm in Wapello County on which, at the time of his death, there was a mortgage indebtedness of approximately $9393.39. He also owned farm equipment and other personal property. He left his widow, Margaret Sterling, and two adult sons, Everett A. Sterling, one of the appellants, and the appellee, Leslie Sterling.

On January 31, 1941, almost a year after the death of Emery Sterling, J. A. Breon was appointed administrator of his estate and on February 14, 1941, a partition action relative to the farm was commenced. It was later dismissed. The inventory and inheritance tax report filed in the estate disclosed the 200-acre farm had an estimated value of $18,000 and the personal property was valued at $4609.71. In addition to the mort-

gage indebtedness previously mentioned it was shown by the inventory there was an estimated indebtedness of $1000. In connection with the claims of Everett A. Sterling and his wife, to which reference will be hereinafter made, there was testimony of witnesses the real estate was worth $110 per acre or $22,000 at the time of the father's death and the personal property at that time had an approximate value of $6000.

It is the claim of Everett and his wife that J. A. Breon, acting as administrator and also in an individual capacity, instigated negotiations in the interest of Leslie Sterling and sought to have Everett Sterling and his wife dispose of their interest in the father's estate to the brother. Breon had a conference with Everett in Ottumwa sometime between February 5 and February 10, 1941, at which time matters in connection with the father's estate were discussed. It appears Everett Sterling was indebted to a bank in Hedrick, which fact was known by Breon. At the time of the original conversation and in later conversations between Breon and Everett the value of the land was discussed. During one of these conferences Everett contended it was worth $100 an acre and at that time Breon made reference to Everett's indebtedness to the bank. It is suggested the bank indebtedness was used as a leverage to bring about the conveyance by him of the property transferred. Everett testified Breon indicated he thought the land was worth $75 an acre while he maintained it was worth $100 an acre.

Later a conference was had relative to the possible sale and transfer of Everett's one-third interest in his father's estate to Leslie. At that time Leslie indicated he valued the land at $80 per acre. Everett testified that at this meeting, which was held at the home of J. A. Breon, there was no reference made to or concerning an assignment of his interest in a possible expectancy in his mother's estate.

Relative to this fact the testimony of Everett discloses the following: "Q. Now, this I want to ask you * * *: Was there any discussion there at that time with regard to any future interest you might have in your mother's estate? A. No. Q. * * * What was said that evening and what finally was done? A. Jess [Breon] done the figuring and he figured $3500 and he told me to meet him at the bank the next morning."

On cross-examination he testified: "Q. And as I understand you were claiming a third interest in the farm at that time? A. Yes. Q. And Leslie a third and your mother a third? A. Yes. Q. As I also recall you testified that the personal property was not discussed that night at all? A. No. Q. Now, after you agreed on a valuation of $90 an acre for 200 acres, which would be $18,000, then as I understand you, you deducted this principal mortgage debt of $9393? A. Yes. Q. And when you done that that would leave a value of $8607 and then you divided that into three parts? A. Yes. Q. And that would make $2869 for each third share. Now, what I am interested in is knowing what made up the difference between the valuation of your interest in the real estate, as you tell me it was computed, of $2869 and the $3500 which he paid you? A. I was selling my share in father's estate for $3500. Q. Well, I thought you told me you agreed on $90 an acre? A. No, I was selling my share in my father's estate for $3500. Q. Well, what I am trying to find out is how you arrived at the figure of $3500? A. That is the way Jess figured it out—$3500 we settled on. Q. At the meeting at Jess Breon's house on the evening of February 24, 1941, the value of the personal property or the disposition of it wasn't even discussed, is that right? A. No. I just sold my third interest in my father's estate for $3500. Q. * * * Now, did you or not agree to sell your third interest in your father's farm on the basis of $90 an acre? A. I was selling my third interest in father's estate for $3500. Q. I thought you said you had agreed on a valuation of $90 an acre? A. I said I was selling it for $3500."

On the following morning, which was February 25, 1941, Breon, Leslie and Everett had a meeting at a bank. At that time two checks were written and signed by Leslie and held by Breon. One of the checks was for $1249.63, which was to the bank and apparently would be in payment of Everett's indebtedness to it, and the other check was made payable to Everett for $2250.37. Later the three parties met in an attorney's office in Ottumwa and three written instruments were prepared which are of importance in this litigation.

Exhibit P-3, an agreement, is as follows:

"THIS AGREEMENT, made and entered into this 25th day of February, 1941, by and between Everett A. Sterling and Buelah Sterling, his wife, parties of the first part, and Leslie D. Sterling, party of the second part, all of Wapello County, Iowa, WIT-NESSETH:

"Everett A. Sterling has an undivided one-third interest in the Southeast Quarter, and East one half of the East one half of the Southwest Quarter of Section 18, Township 75 [73], Range 12, Wapello County, Iowa, which he received as an heir-at-law of Emery W. Sterling, deceased, and Everett A. Sterling has an undivided one-third interest as an heir-at-law of Emery W. Sterling of certain personal property, which was the property of Emery W. Sterling, now deceased.

"That the second party is desirous of buying all the right, title and interest in the estate, and in the real estate, and does hereby pay to Everett A. Sterling and Buelah Sterling the sum of Thirty-five Hundred Dollars ($3500), and for and in consideration of the payment of $3500, which is hereby acknowledged by first parties, the first parties convey by quitclaim deed, all their right, title, and interest in and to the above described real estate, and by a separate assignment, assign all their right, title and interest in and to the estate of Emery W. Sterling, deceased, to Leslie D. Sterling.

"It is the intention of the parties hereto, and they do hereby agree that all the right, title and interest in and to any real or personal property which may be left by Margaret Sterling, mother of Everett A. and Leslie D. Sterling, shall be the property of Leslie D. Sterling in so far as these parties have a right to so sell, assign or transfer.

"And first parties hereby disclaim any right, title or interest in and to any property that might be left by Margaret Sterling at the time of her death.

"And this agreement is considered and is a sale of any interest the first parties might have in the estate of Margaret Sterling.

"Dated this 25th day of February, 1941.

/s/ Everett A. Sterling    /s/ Leslie D. Sterling
/s/ Beulah E. Sterling       Second party."
    First parties.

Exhibit P-4 is an assignment and waiver by Everett A. Sterling and his wife, Beulah E. Sterling, of their interest in the estate of Emery W. Sterling and is as follows:

"For value received, the undersigned hereby sell and transfer, all their right, title and interest in and to the estate of Emery W. Sterling, to Leslie D. Sterling, and these parties hereby waive any notice of final settlement of said estate, and consent that any report may be filed by the administrator in said estate, and the same may be approved without notice to the undersigned.

"Dated this 25th day February, 1941.

/s/ Everett A. Sterling
/s/ Beulah E. Sterling."

Exhibit P-5, a quitclaim deed covering the land here involved, was also executed at this same time and is, in part, as follows:

"Know all Men by these presents: That we, Everett A. Sterling and Beulah Sterling, husband and wife, of Wapello County and State of Iowa in consideration of the sum of One Dollar and other considerations - - - Dollars to me in hand paid by Leslie D. Sterling - - - of Wapello County and State of Iowa, the receipt whereof I do hereby acknowledge, have bargained, sold and Quitclaimed unto the said Leslie D. Sterling and to his heirs and assigns forever all my right, title, interest, estate, claim and demand, both at law and equity, and as well in possession as in expectancy of, in the following described premises, to-wit:

"An undivided one-third interest in the Southeast quarter, and the East half of the East half of the *the* Southwest quarter of Section 18, Township 73, Range 12, Wapello County, Iowa.

"The intention is to convey all interest grantors now have or may hereafter have as heirs-at-law of Margaret Sterling.

"Rev. Stamps $3.30

2-25 1941 E.A.S.

with all and singular the hereditaments and appurtenances thereunto belonging.

"And the Beulah Sterling hereby relinquishes her right of dower in and to the above described premises.

"Signed this 25th day of February 1941.

/s/ Everett A. Sterling

/s/ Beulah E. Sterling."

Everett's testimony concerning the matters that transpired at the attorney's office in Ottumwa is in part as follows:

"* * * A. Well, Jess, he had the figures in his pocket and he had the papers fixed out. Q. Who did the talking to Mr. Schaefer? A. Jess Breon done all the talking. He said he was representing my brother. Q. Did you have any part in that conversation? A. No, I didn't. Q. I am handing you a couple of pieces of paper which are marked Exhibits P-3 and P-4, and I will ask you to state if you have any exact knowledge as to where those papers were made out? A. They were made out in Schaefer's office. Q. Who gave the instructions as to how these papers were to be made out? A. Jess Breon. Q. Now, when Jess Breon gave the instructions as to how those papers were to be made out, and I am referring to Exhibits P-3 and P-4, did he have with him any papers from which he read or which he used when he gave the instructions to Mr. Schaefer? A. Yes, he had a paper he got out of his pocket there and handed them to Schaefer's bookkeeper or told her how to fix them out. Q. Now, up to the time that you went to Mr. Schaefer's office, had there ever been any discussion between yourself, Jess Breon or your brother with regard to any sale by you of any future interest in your mother's estate to your brother? A. No. Q. Now, I will ask you to state what the fact is if there was any discussion of these papers, Exhibits P-3 and P-4, before or at the time you and your wife signed them? A. Papers—which ones is that? Q. Exhibits P-3 and P-4, and I will add to that question, also Exhibit P-5. Look them all over * * * and you can answer it. A. Yes, there was—yes, over this Margaret Sterling estate. Q. All right, now, in your own words you tell what was said by the various people that were there at that time. A. Jess said to go ahead and sign it, it wouldn't make any difference, that I would get my share in my mother's estate at her death just the same. Q. How did he happen to say that? A. I mentioned it to him there. Q. What did you say to him? A. I asked him how come he had it in there; there wasn't nothing

said about it the night before. Q. Had anything been said before about that? A. No, there hadn't. Q. Was there any further discussion about that being in the papers there between you and Jess Breon? A. I asked Schaefer about it and he said to go ahead and sign them. Jess said it didn't make any difference, I would get my share of my mother's estate and to go ahead and sign them. Q. That was said to you? A. Yes. Q. Now, I will ask you to state what the fact is as to whether or not you understood that the papers that you were signing purported to transfer to your brother your future interest, if any, in your mother's estate? * * * A. No. Q. Now, when you signed those papers Exhibits P-3 and P-4 and P-5, I will ask you to state what the fact is as to whether or not you signed them with the understanding that you were to get your share in your mother's estate, if any, in the future? * * * A. Yes. Q. Now, I will ask you to state what the fact is as to whether or not your brother ever had any part in all of that conversation during that day? A. No, he never said a word. Q. Who was the man that handled the whole affair? A. Jess Breon. The first time I became fully aware of the claim of my brother that he owned my interest in my mother's estate was in July, 1955."

Over timely objections Mr. Breon testified concerning what transpired at the attorney's office in part as follows:

"Q. What was said to Mr. Schaefer, if anything, in his office in your presence about the drawing of any papers? * * * A. The terms was he was to buy Everett's equity and get the life estate of the mother, and they wanted a paper prepared by him that would be fair to both of them, and left it to him to do it as an attorney, and he took care of it. * * * Q. State whether or not that instrument was dictated by Mr. Schaefer to his secretary? * * * A. To the best of my recollection, it was. Q. During the course of that dictation or at the end thereof, state whether or not either Leslie Sterling or Everett Sterling or Mrs. Everett Sterling made any objection to the manner in which that dictation was given. * * * A. They didn't make any objection. Q. After the instrument Exhibit P-3 was written, state whether or not Mr. Schaefer or his secretary or anyone else gave the instrument to you or Leslie Sterling or

to Everett Sterling to read before signing. * * * Q. Did you see them reading it? A. I did. Q. Did you see them sign it? * * * A. I did."

It is the particular claim of Everett A. Sterling and his wife advantage was taken of them in relation to the conveyance by them of Everett's possible interest in his mother's estate.

Margaret Sterling died intestate on July 16, 1955. She had never remarried. During the years immediately prior to her death she lived in the town of Farson, Wapello County, Iowa. At the time of her death she held her undivided one-third interest in the 200-acre farm and a claimed interest in the farming enterprise and certain personal property. The residence where she resided was held in joint tenancy with her son Leslie Sterling. She also held a joint checking account with him. He was named as administrator of the mother's estate.

The inventory filed in her estate shows the following items and valuations: (a) An undivided one-third interest in 200 acres land, $15,000; (b) personal property, $1000; (c) residence in town of Farson held in joint tenancy with Leslie D. Sterling, $2000; (d) checking account held jointly with Leslie Sterling with adjusted balance at the time of death, $508.16.

The inventory also shows an estimated indebtedness of $1500. In connection with the claims made by Everett A. Sterling and his wife evidence was presented which disclosed certain witnesses placed a value on the 200-acre farm at the time of the mother's death of $265 per acre, or a total value of $53,000.

Everett and his wife, in presenting their appeal, make no claim to the undivided one-third interest which Everett received as an heir of his father and which he conveyed to Leslie. They likewise make no claim to an undivided one-third interest which Leslie received from his father's estate. They also make no claim to an undivided one-half interest in the mother's estate which Leslie received as an heir of the mother, same being a one-sixth interest of the whole. The total interest to which they make no claim amounts to five sixths of the real and personal property of the father's estate. It is not questioned that by the agreement and quitclaim deed Everett and his wife conveyed all the right, title and interest he had to the real and personal property owned by Emery W. Sterling, the father, at the time of his death.

However, Everett claims he is entitled to one half of her property or one sixth of all the real and personal property in the father's estate. It is his contention that the parts of the agreement and quitclaim deed which seek to convey his prospective interest in the property of Margaret Sterling at the time of her death were void and ineffective inasmuch as it was unconscionable, procured by fraud, in violation of a confidential relationship and based on inadequate or no consideration.

I. In regard to the final report of Leslie Sterling as administrator of his mother's estate it is shown he made all necessary reports and took all necessary actions in connection with the administration of the estate. From a review of all matters presented concerning it we are satisfied the administrator has sustained the burden of proof regarding his report as required by our holdings. In re Estate of Rinard, 224 Iowa 100, 106, 275 N.W. 485, and cases cited; In re Guardianship of Morris, 228 Iowa 646, 649, 292 N.W. 836.

█ It must be kept in mind Everett and his wife, in their objections to the final report and in their defenses in the quieting-title action, made certain affirmative allegations. They have the burden of sustaining their claims of fraud, inadequacy of consideration, lack of good faith, and existence of a confidential relationship. In re Estate of Lundvall, 242 Iowa 430, 435, 436, 46 N.W.2d 535.

██ As previously noted there was a meeting on February 24, 1941, at the home of J. A. Breon where in addition to Breon there were Everett, his wife and Leslie. It is Everett's claim there was no discussion concerning his possible interest in the estate of his mother. In connection with this contention it is of interest and of particular import in this case to note in the testimony of Breon he quoted Everett's wife as stating regarding her husband's anticipated interest in the mother's estate: "She said they would never get any of it anyhow because his mother would give it all to Leslie." This attributed statement was not denied by Everett when he was a later witness. Everett's wife was never called as a witness and consequently did not deny the statement. It thus is affirmatively shown there was a discussion of Everett's possible interest in his mother's estate. We are unable to find and hold there was any fraud and misrepresenta-

tion on the part of Leslie or Breon in regard to the transfer of the possible interest in Margaret Sterling's later estate. We are unable to conclude Everett and his wife sustained their allegations of fraud and the burden of proof required of them. Fraud is never presumed and evidence to sustain such an allegation must be clear, satisfactory and convincing. England v. England, 243 Iowa 274, 278, 51 N.W.2d 437, and cases cited.

II. It is the particular claim of Everett Sterling the assignment of his expectancy and future interest in his mother's estate to Leslie Sterling was unconscionable, and there was inadequate or no consideration.

The vital matter for our determination is whether the agreement, Exhibit P-3, and the quitclaim deed, Exhibit P-5, constituted an effective and valid transfer of the interest and title of Everett A. Sterling as a prospective heir to the real and personal property of Margaret Sterling.

We shall not set out the computations that might be detailed concerning whether there was adequate consideration for the assignment of the anticipated interest of Everett in his mother's estate. Our review of the evidence satisfies us there was and that the matter was considered during the negotiations and prior to the execution of the written instruments. Likewise, we cannot conclude the effect of the agreement and the quitclaim deed was unconscionable.

We are impressed with the fact the complaining parties made an assignment of their interest in the father's estate, as shown by Exhibit P-4, and now make no claim of overreaching by reason of that instrument. It is apparent there was ample consideration over and above the value of Everett's interest in the father's estate to afford consideration for the transfer of the anticipated interest in the mother's estate.

An assignment of an expectancy to an estate is valid if in good faith and for an adequate consideration. Richey v. Richey, 189 Iowa 1300, 1303, 179 N.W. 830; Reichard v. Chicago, B. & Q. R. Co., 231 Iowa 563, 577, 1 N.W.2d 721.

We must keep in mind the basis of the value of all the properties and interests conveyed must be determined as of the time of the transaction. Christians v. Christians, 241 Iowa 1017, 1022, 44 N.W.2d 431.

III. We are unable to find in the evidence facts from which it could be held there was any confidential relationship between the brothers which influenced the transfer of the possible inheritance from Margaret Sterling, the mother. This relationship must be clearly established before it can be considered in connection with a claim of fraud. Blood relationship does not in itself create a confidential relationship. Stephenson v. Stephenson, 247 Iowa 785, 794, 74 N.W.2d 679.

Everett is the only witness who testified in support of his contentions. His wife did not substantiate his claims, and the attorney in whose office the papers were prepared was not called as a witness. We can reach no other conclusion but that Everett has failed in the required degree of proof to support his various claims.

We are satisfied the trial court reached the right result. We consequently affirm.—Affirmed.

All JUSTICES concur except LINNAN, J., who takes no part.