**Debra L. STOTLER, a minor by Barbara Jean Stotler, mother and next friend, Appellees,**

v.

**LUTHERAN SOCIAL SERVICE OF IOWA, Appellant.**

**No. 56275.**

Supreme Court of Iowa.

July 3, 1973.

Dickinson, Throckmorton, Parker, Mann-heimer & Raife, by Robert E. Mannhei-mer, Paul R. Tyler, and F. Richard Ly-ford, Des Moines, for appellant.

Arthur K. Anderson, Des Moines, for appellees.

RAWLINGS, Justice.

By equity action plaintiff unwed mother seeks judicial invalidation of a written agreement by which she released her infant child to defendant agency for adoptive placement. Defendant appeals from decree granting relief sought. We reverse.

About July 15, 1972, plaintiff, Debra L. Stotler (Debra) and her mother, Barbara Stotler (Mrs. Stotler), appeared at the Des Moines office of defendant, Lutheran Social Service of Iowa, a licensed child placement agency (agency) and there conferred with its representative, Shirley Delores Furtick. Evidence as to the ensuing discussion is in conflict. Debra and her mother testified to the effect Miss Furtick represented to them a child placement relinquishment could be rescinded anytime within 30 days after execution of release papers, and within one year with the aid of an attorney. That is denied by Miss Furtick. She testified the Stotlers were advised regarding two types of documents available, one being an agreement for temporary child foster care, the other for a permanent adoption.

Additionally, Miss Furtick testified she had been told by Mrs. Stotler that in her opinion Debra was not ready to assume child care responsibilities; both Mr. and Mrs. Stotler were under doctor's care; Debra might continue her schooling; and Mrs. Stotler's health would not permit her to care for the baby. For the most part the foregoing is testimonially disputed by Mrs. Stotler.

According to Miss Furtick it was agreed, at time of the office conference, Debra would release her child to agency for permanent placement.

November 17, 1972, or nine days after Debra became 18, a son was born to her at Broadlawns Hospital in Des Moines. The agency was then contacted whereupon Miss Furtick called on Debra. Mrs. Stotler was in the hospital room during most of the time Miss Furtick was there present. Evidence as to what was then said by Debra and Miss Furtick is, in substance, substantially as heretofore related with regard to the office conference.

It further appears Miss Furtick inquired, while at the hospital, as to whether Debra wanted more time to think about the adoption matter before signing the papers, to which Debra responded in the negative and declared she would rather go ahead and get it over.

Without question Debra also then sought, through her mother, parental advice in the matter. Thereupon the latter left the hospital room and upon returning stated, in essence, Debra's father had opined it was her decision to make.

The record also discloses Alice Marie Rowe, a hospital medical social worker unaffiliated with agency, appeared in Debra's room but heard no part of the above mentioned controverted discussion. Her testimony does reveal, however, she asked whether Debra knew what she was doing, to which the latter responded affirmatively and stated she was giving up her baby.

Ultimately Debra signed, without reading, six regularly witnessed copies of a release agreement which provided, in part:

"* * * fully understanding that she is hereby terminating all her rights in said child, the undersigned does hereunto set her hand this 20th day of November, 1972". Four days later agency placed the child in an adoptive home.

About December 15, 1972, Debra requested the agency return her child. That being refused the instant action was commenced.

Issues presented by agency for review are:

(1) is plaintiff's child recovery right limited by provisions of The Code 1971, Chapter 238;

(2) does general contract law apply to plaintiff's release of her infant child for adoptive placement by defendant agency;

(3) are circumstances attending the execution of an unequivocal child release for adoption agreement determinative as to its validity;

(4) if a parent executes an absolute child adoption placement agreement under the unexpressed belief it is conditional only, is this such a mistake of fact as to make the instrument voidable?

These issues will not be dealt with divisibly or in the order assigned.

I. Before entertaining them it is essential we resolve the extent of our review, inceptionally questioned by Debra. In that vein she contends the notice of appeal restricts our consideration of this case to the propriety of trial court's order overruling agency's motion for a new trial. We are not so persuaded. See Hawkeye Security Insurance Co. v. Ford Motor Co., 199 N.W.2d 373, 378 (Iowa 1972).

II. A consideration of the problems instantly posed necessitates a prefatory analysis of some relevant basic principles regarding the subject at hand.

■ Adoption is a creature of statute, being unknown to common law. See in re Adoption of a Baby Girl, 248 Iowa 619, 623, 80 N.W.2d 500 (1957); 2 Am.Jur.2d, Adoption, §§ 2–3; 2 C.J.S. Adoption of Persons § 2.

■ Although such statutes have been subject to strict construction in some jurisdictions this court has not adhered to that concept for at least the past 70 years. See Hopkins v. Antrobus, 120 Iowa 21, 24, 94 N.W. 251 (1903). See also Corbett v. Stergios, 257 Iowa 1387, 1396, 137 N.W.2d 266 (1965).

Moreover this standard is clearly in keeping with Code § 4.2, which states:

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this Code. Its provisions and all proceedings under it shall be liberally construed with a view to promote its objects and assist the parties in obtaining justice."

■ On the other hand, failure to comply with statutorily prescribed procedures is fatal to the power of a court to decree an adoption. See In re Adoption of Moriarty, 260 Iowa 1279, 1286, 152 N.W.2d 218 (1967).

■ III. Although our review is de novo it is limited to issues duly presented upon evidence properly introduced in course of trial. And in considering credibility of witnesses we accord weight to trial court's findings but are not bound by them. See Iowa R.Civ.P. 344(f)(7); In re Adoption of Keithley, 206 N.W.2d 707, 711–712 (Iowa 1973); In re Estate of Cory, 184 N.W.2d 693, 695 (Iowa 1971); In re Adoption of Blanchard, 179 N.W.2d 441 (Iowa 1970).

IV. At this point it should also be noted, in this state parental rights may be *involuntarily* terminated only by an order or decree of court for neglect of a child as that term is defined in Code chapter 232. See In The Interest of Wardle, 207 N.W.

2d 554 (Iowa, opinion filed May 23, 1973). See also Code § 238.26; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

V. Distinguishably, however, our problem centers upon the matter of a controverted *voluntary* release of an infant to a child placement agency for purpose of adoption. In that regard the court, in People ex rel. Scarpetta v. Spence-Chapin A. Serv., 28 N.Y.2d 185, 269 N.E.2d 787, 791, 321 N.Y.S.2d 65 (1971), found no perceivable distinction in principle between release to an authorized agency and direct adoption surrender to an individual. But that finding was promptly subjected to severe criticism. See 166 N.Y.L.J. 26 (1971).

Be that as it may we find it unnecessary to here resolve the above matter and confine our review to the factual situation instantly before us.

■ VI. Unquestionably the release of an infant by an unwed mother to a licensed child placement agency is statutorily permitted. In other words, even though Debra was then only 18, the release of her newborn son to agency for purpose of adoption was, per se, lawfully proper. See Code §§ 238.26–238.28, 600.3.

VII. Trial court found the equity action instituted by Debra was predicated upon a claim of mistake on her part in execution of the child release agreement and accordingly granted the relief prayed.

Agency claims this constituted error because the setting aside of such a release is restricted by Code 238.29, which provides:

"Children so surrendered may not be recovered by the parents except through decree of court based upon proof that the child is neglected by its foster parent, guardian, or custodian, as neglect is defined by the statute relating to neglected children."

It is to us apparent this legislative enactment presupposes a valid child relinquishing agreement which, if given, can be re-voked only for neglect of the child. Stated otherwise it does not relate to the issue here posed, i. e., validity of the releasing instrument. Therefore agency's claim is misdirected.

■ At the outset it will be noted, every consent to an adoption must designate the adopting parties. See Code § 600.3; In re Adoption of a Baby Girl, 248 Iowa 619, 623, 80 N.W.2d 500 (1957). It therefore follows, in private adoption cases the identity of the adopting parties is inceptionally made known to the consenting party, thus precluding anonymity.

Unlike the situation attendant upon privately arranged adoptions, licensed agencies can effect beneficial pre-placement evaluations of both child and prospective parents at the same time acting as an intermediary, thus to some degree preserving anonymity of the parties. See Code § 238.-4; McCurdy v. Albertina Kerr Homes, Inc., 498 P.2d 392, 395 (Or.App. 1972). See also S. Katz, "Judicial and Statutory Trends in the Law of Adoption", 51 Geo. L. J. 64, 65–67 (1962); H. Uhlenhopp, "Adoption in Iowa", 40 Iowa L.Rev. 228, 237–240 (1955).

Consequently, it must be assumed the legislature intended, by enactment of chapter 238 and more particularly § 238.29 the validity of a child relinquishing agreement be judicially determined under applicable principles of equity, at the same time protecting, as far as possible, benefits attendant upon relative anonymity of the adoptive parents. Any other view would distort or make Code § 238.29 relatively meaningless. And in that regard this court has repeatedly taken the position we cannot assume the general assembly intended to enact a law which is futile or leads to illogical consequences. See e. g., Jones v. Iowa State Highway Com'n, 207 N.W.2d 1 (Iowa, opinion filed April 25, 1973); Northern Natural Gas Company v. Forst, 205 N.W.2d 692, 695 (Iowa 1973); State v. McGuire, 200 N.W.2d 832, 833 (Iowa 1972).

■ Briefly stated, Code § 238.29 is directed to the matter of child protection, not to parental rescission rights.

VIII. What then is the rule in this jurisdiction as to right of a parent to secure judicial abrogation of the written release of his or her child to a licensed agency for adoption placement?

On this subject S. Katz peripherally states in 51 Geo. L. J., *supra,* at 87–90:

"Legislatures and courts have assumed a variety of positions with regard to withdrawal of parental consent to an adoption in the United States. At one extreme is the rule that consent, once given, is thereafter absolutely irrevocable, absent fraud or duress. On the other hand, some of the cases indicate that parental consent is absolutely revocable until the final decree of adoption is issued. Between these two extremes is to be found the position of the Model Adoption Act., and that of many American jurisdictions which regards the question of withdrawal of consent as one for the discretion of the court.

"It seems that the discretionary rule embodied in the Model Adoption Act represents the modern trend. Only two states, Florida and Illinois, appear to cling to the rule that consent is absolutely irrevocable. And the reasoning with which the older cases buttressed the absolute-right-of-revocation rule—that parental consent being necessary to an adoption, withdrawal of such consent before the final decree had 'vested' any right to the child in the adoptive parents deprived the court of jurisdiction to decree the adoption—is no longer generally followed.

"In line with this trend the discretionary rule has been expressly adopted by statute in some jurisdictions. Thus, Minnesota, formerly a leading jurisdiction in applying the absolute-right-of-revocation rule, has come to the discretionary rule by statute. The Georgia statute similarly provides that parental consent, once given, 'may not be revoked by the parents as a matter of right.' A Maryland statute provides that the adoption petition may be granted without parental consent if such consent is withheld 'contrary to the best interests of the child.' A Delaware statute allows the natural parents sixty days after the giving of consent within which to seek the court's permission to revoke it. And the Uniform Adoption Act takes the position that consent should be revocable in the discretion of the court until the interlocutory decree is issued. In evaluating the merits of these various positions, one can sympathize with the view of some social welfare agencies favoring the rule which denies revocation altogether since a great deal of effort goes into the placement of a child, and the revocation of parental consent would disrupt the adoption plan. However, it would also seem that fairness to the natural parents demands a less rigid rule than absolute denial of any right of revocation. For, parents are the natural custodians of their children and they should be granted every reasonable opportunity to maintain what one court has called 'the sacred relationship of parent and child.'

"Finally, it must be remembered that here as in other areas of adoption law there are three parties involved—the natural parents, the adoptive parents, and the child—all of whose rights and well-being must be considered. Of course natural parents should have an opportunity to maintain their relationship with their child; but to give them the absolute right to revoke consent at any time, or even within a limited time at their unrestricted election, would result in uncertainty with regard to the disposition of the case and the welfare of the child. With the threat of the natural parents' revocation hanging over the adoptive parents, placements would be difficult. Adoptive parents would tend to feel insecure with regard to the adoption, and

this feeling might have a detrimental effect in their relationship with their adoptive child. Further, the adoptive child might suffer as well, as a change in environment after a child has become settled in his adoptive home might cause serious psychological problems. Finally, to give the natural parents an unfettered right of revocation, even for a limited time, could provide them with the power to choose between contesting sets of adoptive parents; this could conceivably provide an opportunity for them to extort money from the adoptive parents in return for a promise not to revoke consent.

"The discretionary rule embodied in the Model Adoption Act has the advantage of avoiding these dangers posed by the rigidity of the extreme positions. It permits the court to weigh all of the factors in an adoption case, and to approve a revocation when the facts of the individual case warrant it. But like any rule which places great reliance upon judicial discretion, it has the drawback of furnishing no specific criterion to aid the court in reaching a decision."

See also 28 U.Chi.L.Rev. 564 (1961).

. By reason of the delicate interrelated human rights and sensibilities involved the task at hand is neither lightly undertaken nor can it be easily fulfilled.

■ At the threshold it will be observed the legislature has wisely directed, a child release agreement such as now before us shall be not voided "except through decree of court". Flowing from this directive is the understanding our general assembly must have meant a parent's child releasing agency agreement is neither irrevocable nor may it be arbitrarily withdrawn. From this it follows, a parent cannot be permitted to have an executed adoption releasing agreement set aside absent good cause shown. See Adoption of McKinzie, 275 S.W.2d 365, 372 (Mo.Ct.App.1955); 2 C.J.S. Adoption of Persons § 71.

■ IX. Referring now to consents executed in connection with privately arranged adoptions, Iowa is recognized as one of the jurisdictions adhering to the majority view, i. e., voidance of such consent is a matter resting in the sound discretion of the court. See 51 Geo.L.J. at 88, and 36 Albany L.Rev. 578 (1972), both citing In re Adoption of Cannon, 243 Iowa 828, 53 N.W.2d 877 (1952).

■ We accept the foregoing accreditation and further hold it applicable to the setting aside of agreements by which parents or other authorized parties release children to a licensed agency for adoption placement. As to "sound judicial discretion", here held applicable, see Riley v. Wilson Concrete Company, 184 N.W.2d 689, 690 (Iowa 1971); Jones v. Swanger, 167 N.W.2d 702, 704 (Iowa 1969); Black's Law Dictionary at 1567 (rev. 4th ed. 1968).

But this does not alone resolve the problem before us.

X. Mindful of the foregoing we deem it appropriate to at this time enunciate a standard by which litigants may be guided, and courts in turn better able to evaluate "good cause" as applied to cases such as this.

■ To the end that any doubts in this field be resolved we now hold, the equitable principles of fraud, misrepresentation, duress, overreaching, mistake or corruption constitute "good cause" upon which a relinquishing party may be permitted to negate an agreement whereby a child is released to a licensed agency for purpose of adoption. See Mabbitt v. Miller, 246 Iowa 712, 68 N.W.2d 740 (1955); Catholic Charities of Diocese of Galveston v. Harper, 161 Tex. 21, 337 S.W.2d 111, 114–115 (1960); 2 Am.Jur.2d, Adoption, §§ 44, 46–47; 2 C.J.S. Adoption of Persons §§ 11–12, 69–71; Annot., 24 A.L.R.2d 1127, 1140–1148. See also Holden v. Construction Machinery Company, 202 N.W.2d 348, 359 (Iowa 1972); First National Bank in

Lenox v. Brown, 181 N.W.2d 178, 181 (Iowa 1970).

■ And the burden is upon one asserting any such release vitiating element to prove same by a preponderance of the evidence sufficiently clear and satisfactory to overcome the usual presumption of honesty and fair dealing. See Hall v. Wright, 261 Iowa 758, 767–768, 156 N.W.2d 661 (1968); American Sec. Ben. Assn. v. District Court, 259 Iowa 983, 994, 147 N.W.2d 55 (1966); In re Estate of Sterling, 249 Iowa 1260, 1270, 92 N.W.2d 138 (1958); 27 Am.Jur.2d, Equity, §§ 31–34, 237; 37 Am.Jur.2d, Fraud and Deceit, § 469; 30A C.J.S. Equity § 479; 37 C.J.S. Fraud § 114.

■ XI. It also follows, an agreement by which a parent or other authorized party releases a child to a qualified agency for adoption placement stands in contract. See 2 Am.Jur.2d, Adoption, §§ 13–14; 2 C.J.S. Adoption of Persons §§ 25, 28. See also People ex rel. Scarpetta v. Spence-Chapin A. Serv., 28 N.Y.2d at 191, 269 N. E.2d at 790, 321 N.Y.S.2d at 69; 36 Albany L.Rev. at 586.

As previously disclosed, however, any such agreement must be executed in strict conformity with statutorily prescribed procedures and is subject to court approval.

XII. These holdings are not to be construed as meaning the above noted "sound judicial discretion" concept is either abandoned or diluted.

Rather our instant pronouncements regarding "good cause" relate primarily to the basis upon which a child relinquishing parent or party may secure the judicial voidance thereof.

■ Moreover, any asserted agreement vitiating factor, *supra,* shall be weighed by the court in light of *all* relevant evidence attendant upon execution of an agreement such as is here involved. See Cogley v. Hy Vee Food Stores, Inc., 257 Iowa 1381, 1386, 137 N.W.2d 310 (1965); Adoption of McKinzie, Mo.App., 275 S.W.2d at 372; 27 Am.Jur.2d, Equity, § 34.

■ And if it be thus found, in the exercise of sound judicial discretion, the challenging party has adequately established revocable "good cause" the child's best interests and welfare may then come into play. See 40 Iowa L.Rev. at 275–282. See also M. & O. Merrill, "Toward Uniformity in Adoption Law", 40 Iowa L. Rev. 299, 313 (1955).

■ XIII. Trial court, as previously disclosed, found plaintiff's case was predicated solely upon alleged "mistake".

· Since neither party here assails that holding our review is accordingly confined.

No useful purpose will be served by restating at length the factual situation heretofore set forth.

Briefly stated Debra claims she was confused by what Miss Furtick said to her in course of their prenatal agency office conference, and at the hospital. Under existing circumstances it thus appears Debra instantly seeks relief predicated upon an alleged unilateral mistake. See generally 3 Corbin on Contracts, §§ 607–610; McClintock on Equity, §§ 88–91 at 237–248 (2d ed. 1948); 27 Am.Jur.2d, Equity, § 34.

XIV. As already revealed Debra signed the questioned instrument without reading it. On that point this court has repeatedly held, where property transactions are involved, rescission by the negligent party is precluded. See e. g., Schlosser v. Van Dusseldorp, 251 Iowa 521, 528, 101 N.W.2d 715 (1960). See also 3 Corbin on Contracts, § 607; McClintock on Equity, §§ 90–91.

But we deal here with sensitive personal relationships which justify, if not necessitate, a more equitable approach.

Furthermore, it will be recalled Debra asserts, in essence, she relied on some am-

biguous statements made to her by Miss Furtick.

So the ultimate question posed is whether Debra established her claim by the required degree of proof.

There are several factors which militate most forcefully against plaintiff. In that area the record discloses, to our satisfaction:

(1) Debra was the adoption initiating party;

(2) upon birth of the child Miss Furtick was contacted and accordingly responded by visiting Debra at the hospital;

(3) during the hospital conference Mrs. Stotler was present and her testimony reveals, in part, (a) Miss Furtick never said anything about a temporary release, (b) Debra was asked whether she wanted to give the child up for adoption and she answered in the affirmative, (c) Mrs. Stotler at one time left the hospital room and on returning stated her husband had said the decision was up to Debra;

(4) Mrs. Rowe, a disinterested party, while in the hospital room inquired as to whether Debra knew what she was doing and the latter responded "Yes * * * she was giving up the baby";

(5) Debra was also asked by Miss Furtick if she wanted more time to think about releasing her child before signing the agreement and Debra answered in the negative;

(6) agency was led to believe and reasonably concluded Debra intended to release her child for permanent adoption placement;

(7) November 24, 1972, the child was accordingly placed in an adoptive home.

A de novo review of the entire record before us may reveal some evidential conflicts and attendant doubts but the burden was upon plaintiff to do more than create fragmented possibilities.

Sympathetic as we are with Debra's position it still remains she failed to establish her right to the relief sought by the requisite degree of proof. For all the reasons heretofore set forth we now hold the controverted agreement is valid and binding. Therefore trial court erred in holding adverse to defendant Lutheran Social Service of Iowa. Compare with Mabbitt v. Miller, *supra;* Watt v. Dunn, 236 Iowa 67, 17 N. W.2d 811 (1945); People ex rel. Stone v. Maglio, 62 Misc.2d 292, 308 N.Y.S.2d 604 (1970); Hamer v. Hope Cottage Children's Bureau, Inc., 389 S.W.2d 123 (Tex. Civ.App. 1965).

Reversed.

All Justices concur, except UHLENHOPP and McCORMICK, JJ., who concur specially.

UHLENHOPP, Justice (concurring specially).

I. We are not dealing here with a consent to adoption. The child was released to a licensed child-placing agency, and in such a case the agency consents to the adoption. Code 1973, § 600.3. The agency is not seeking to set aside any consent it may have given.

We are dealing instead with a parent's release of a child under chapter 238 of the Code. That chapter authorizes parental releases of children to regulated child-placing agencies, not only for adoption placement but also for other purposes.

Two aspects of releases under chapter 238 are involved: the original *invalidity* of a release, and the subsequent *revocability* of a release which is not itself claimed to be invalid.

Chapter 238 nowhere touches upon the problem of invalid releases—such as those induced by fraud, duress, or mistake. The sections of the chapter implicitly assume that the releases themselves are valid. I think the legislature did not purport to deal

with invalid releases and that it is inconceivable the legislature intended invalid releases should be valid. Hence if a parent, acting with reasonable promptness, proves by a preponderance of the evidence that a release was not understandingly or voluntarily given, the release should be set aside. The evidence should be scrutinized carefully, however, as an attempt to invalidate a release may result from a change of mind of a parent rather than invalidity of the release, and the child and his custodians also have interests to be considered.

But chapter 238 does deal with the problem of revocability of releases which are not themselves challenged. The legislature could have been silent on that subject too, in which event this court would have to say whether valid releases are subsequently revocable and, if so, on what grounds. The legislature itself, however, chose to deal with the problem, and provided that a child who has been released can only be recovered upon proof that he is neglected. Section 238.29 states:

> Children so surrendered may not be recovered by the parents except through decree of court based upon proof that the child is neglected by its foster parent, guardian, or custodian, as neglect is defined by the statute relating to neglected children.

In this section the legislature balanced the interests of all the individuals involved. When the original surrender of the child is itself unchallenged, the parents can only recover the child by "proof that the child is neglected." I think we are bound by this statute as written.

II. In the case before us, Debra Statler claims that the release itself was invalid from its inception because she was mistaken as to its import—she did not give it understandingly. She acted promptly, and if she has proved her claim by a preponderance of the evidence we should set the release aside. Upon carefully scrutinizing the evidence, however, I conclude that she

did not sustain her burden of proving that the release is invalid. I therefore concur in reversal of the judgment.

McCORMICK, J., joins this special concurrence.